[PUBLISH]

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

_____

No. 96-3556
_____

D.C. Docket No. 94-CR-03138-1 LAC

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                versus

KENNETH D. ROSS,
JAMES H. ADAMS,

                                        Defendants-Appellants.

_____

Appeals from the United States District Court for the
Northern District of Florida
_____

**(December 19, 1997)**

Before ANDERSON and COX, Circuit Judges, and ALARCÓN[*], Senior
Circuit Judge.

_____
[*]Honorable Arthur L. Alarcon, Senior U.S. Circuit Judge for the
Ninth Circuit, sitting by designation.

ALARCÓN, Senior Circuit Judge:

Kenneth D. Ross and James H. Adams appeal from the judgment entered following their conviction for wire fraud, interstate transportation of money taken by fraud, and conspiracy to commit mail fraud, wire fraud, interstate transportation of money obtained by fraud, and money laundering. The Government persuaded the jury that Ross and Adams conspired to obtain money for their personal use and benefit from two financially troubled insurance companies by falsely representing that the loans were to be used solely for business purposes. To disguise their intent to channel part of the funds for their personal use and benefit, and to escape detection by state insurance regulators, Ross and Adams and their co-conspirators created shell corporations and contrived deceptive paper transactions that had no economic substance.

Ross and Adams contend that the evidence presented to the jury is insufficient to sustain a conviction. They also argue that the court erred in its rulings on the admissibility of evidence and in rejecting certain jury instructions. Finally, they assert that the district court miscalculated their sentence and applied a sentencing guideline that is unconstitutional. We discuss each of these contentions, and the facts pertinent thereto, under separate headings.

We affirm the judgment of conviction because we conclude the evidence is sufficient to persuade a rational trier of fact of

the guilt of the accused of each crime, and we hold that the court's rulings on the admissibility of evidence and its decision to reject defense instructions were free from error.

We vacate the sentence imposed on each defendant and remand for resentencing because the district court failed to make an independent finding that it was persuaded beyond a reasonable doubt that Ross and Adams conspired to commit the offense of money laundering.

## I

### SUFFICIENCY OF THE EVIDENCE

#### A. Background

Ross and Adams contend that the Government failed to present sufficient evidence that they committed any crime. They argue that the Government failed to demonstrate that they defrauded the policy holders of Midwest Life Insurance Co. ("MWL") Gulf National Life Insurance Co. ("GNL"), and state insurance regulators by concealing their intent to divert money for their personal use that had been loaned to corporations controlled by them, in reliance on false representations that it would be used solely for legitimate business purposes -- the purchase of real property and a merchant vessel suitable for conversion into a gambling casino.

The evidence is sufficient to support a conviction if, "after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt."
Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in the
original).  "[A]ll reasonable inferences must be drawn in favor
of supporting the jury's verdict."  United States v. Sawyer, 799
F.2d 1494, 1501 (11th Cir. 1986) (citing Glasser v. United
States, 315 U.S. 60, 80 (1942)).

Ross began his involvement with GNL in 1989.  At that time,
Ross was the chief executive officer of Charter Bank, a
Mississippi savings and loan association.  GNL was experiencing
financial difficulties because of prior bad investments.  GNL had
a $1,000,000 unsecured note in its loan portfolio issued to it by
a failing savings and loan institution.  GNL had a serious
financial problem:  if the note was not paid, GNL would become
insolvent.  GNL concluded that it should dispose of the unsecured
note by using it to purchase real property.  In December 1989,
GNL purchased the Ensley Shopping Center in Pensacola, Florida
from Charter Bank for $4,000,000.  As payment for the shopping
center, GNL assigned the unsecured $1,000,000 note to Charter
Bank, made a cash payment of $1,000,000, and executed a
$2,000,000 promissory note secured by a mortgage on the shopping
center.  The Ensley Shopping Center was operating at a loss prior
to this transaction.  Ross was forced to resign from Charter Bank
when it was taken over by the Resolution Trust Company in March
1990.

On March 13, 1990, Bobby Shamburger and Gary Jackson, the

controlling stockholders and officers of Southshore Holding Company, ("Southshore") opened a bank account in the name of On Line Investment Company and wired $900,345.33 to that account. MWL was a subsidiary of Southshore. On March 30, 1990, Shamburger and Jackson filed articles of incorporation in Nevada for On Line Investment, Inc. ("On Line"). Ross was designated president, secretary, and treasurer of On Line. He was also the only person who had the right to withdraw from the On Line Investment bank account.

On Line was originally created as a straw party to conceal the transfer of first mortgage loans worth $875,000 from Public Investors Life Insurance Co. ("PILICO"), one of the insurance companies owned by SouthShore to MWL, another SouthShore subsidiary. PILICO was insolvent at this time and could not make payments to its policy holders without an infusion of new funds. MWL had been prohibited from purchasing notes from a related company without the consent of the Nebraska Insurance Commissioner. On Line was used to circumvent this restriction. Ross purchased the notes from PILICO with the money on deposit in the On Line Investment bank account. Upon receipt of the notes, Ross assigned them to MWL. Ross was paid $20,000 for participating in this scheme.

Ross's next transaction with MWL involved the Tops'l Beach and Racquet Club ("the Club"), which was located in Sandestin, Florida. The Club cost $25,000,000 to develop, but it failed to

produce sufficient funds to repay the development loan.  The Club was taken over by the NCNB Texas National Bank, which first attempted to sell it for $18,000,000.  After several years without attracting a purchaser, the bank reduced the asking price to $5,450,000.

The Sandestin Golf Resort ("Sandestin") was located next to the Club.  The Bos Holding Company owned Sandestin.  Peter Bos was its largest stockholder.  Sandestin went into bankruptcy on February 7, 1990.  Bos decided that the acquisition of the Club by the Bos Holding Company would create an attractive golf, tennis, and beach resort, and reduce overhead and administration costs through combined management.  An added incentive was the fact that the Club's property included two undeveloped parcels that would be suitable for the construction of a hotel or condominium.  Bos persuaded the Birmingham-Destin Investment Partners ("BDIP") to join him in negotiating for the purchase of the Club.  On May 4, 1990, Bos and BDIP formed the Tops'l Holding Co. Inc. ("THI") for the purpose of purchasing the Club.

On the same date, THI signed an agreement to purchase the Club.  THI was required to make an initial payment of $200,000 as "earnest money."  The purchase and sale agreement provided that, upon consummation of the sale, the earnest money would be applied to the purchase price.

THI was unable to raise the balance of the purchase price from its investors.  Meanwhile, the BDIP partners concluded that

they did not wish to participate in the purchase of the Club. Tom Underwood, a partner in BDIP contacted Ronald Dunston, a Florida real estate broker to seek his assistance in locating someone who would be interested in purchasing the Club. Dunston informed Underwood that Ross was interested in building a beach-front hotel. Ross met with Underwood in the spring of 1990 to discuss the proposed purchase of the Club. Underwood told Ross the purchase price would be $5,500,000.

Ross contacted Shamburger, Jackson, and Jeremiah O'Keefe, the president of GNL and owner of GNL's parent company, to see if MWL or GNL would lend him the money to purchase the Club. Each company expressed an interest in making the loan. On May 1, 1990, Ross presented MWL with a written request for a commitment to loan the money required for the purchase of the Club. On the same date, MWL issued a commitment letter in which it indicated it would provide the entire $5,500,000. Jerry Palmer, MWL's attorney, testified that MWL did not perform any due diligence to determine whether the investment was sound prior to issuing the commitment letter.

Over the next few months, MWL, Ross, Oscar Jordan, a former member of the board of directors of Charter Bank and Ross's attorney, and representatives of Bos and Sandestin conducted negotiations regarding the structure for the purchase of the Club. On June 29, 1990, THI assigned its right to purchase the

Club to On Line[1] in exchange for a payment of $200,000 to reimburse THI for the earnest money it had paid to the owner of the Club. At this point in time, Ross was in a position to purchase the Club because of the $5,500,000 loan commitment he had received from MWL.

In the early part of July 1990, Dennis LaFont, MWL's treasurer, informed Shamburger and Jackson that MWL was going to have to report a loss of $2,300,000 on its second quarterly report to the state insurance regulators in Florida and Louisiana for the period ending June 30, 1990. LaFont was concerned that a loss of this magnitude would subject the company to regulatory action.

Shamburger and Jackson told LaFont that MWL was going to sell an "option" and realize a $5,000,000 gain. The term "option" was apparently used to refer to the purchase and sale agreement for the Club that THI had previously assigned to On Line. Because On Line did not assign its rights under the purchase and sale agreement to MWL prior to June 30, 1990, MWL could not accurately or legally report that it owned the right to purchase the Club prior to June 30, 1990 and that this interest was worth $5,000,000.

To manufacture a paper record that would reflect that MWL

---

[1] While Ross was originally the sole stockholder of On Line, Gerald Taylor, Ross's accountant, testified that Adams acquired fifty percent of the stock in On Line prior to the end of July 1990.

had a $5,000,000 asset prior to June 30, 1990, a letter was prepared on MWL letterhead which stated that MWL and Ross agreed to the termination of MWL's commitment to lend Ross $5,500,000. On August 6, 1990, Ross, acting as president of On Line, assigned its rights under the purchase and sale agreement to MWL. No consideration was paid by MWL for the assignment. On the same date, MWL assigned its rights under the purchase and sales agreement to L'Spot for $5,000,000. Ross was president and director of L'Spot. Adams was also a director. Ross executed a promissory note on behalf of L'Spot in the amount of $5,000,000 to MWL in exchange for MWL's rights under the purchase and sale agreement. In short, Ross, acting as the president of On Line, assigned its right to purchase the Club to MWL for no consideration and then bought it back, as president of L'Spot, for $5,000,000. Shamburger and Jackson instructed LaFont to reflect the $5,000,000 promissory note MWL received from L'Spot on August 6, 1990 as a corporate asset in its second quarter report for the period ending June 30, 1990.

Meanwhile, on July 19, 1990, Adams obtained a commitment for a loan of $1,700,000 from MWL for the purchase of a merchant vessel large enough to serve as a floating gambling casino. Also in July 1990, Dunston, Ross, Adams, and O'Keefe incorporated a company named Casino Beach for the purpose of developing a casino at Diamond Head, Mississippi.

On July 31, 1990, Ross, Adams, Dunston, Shamburger, Jackson

Bos, and others met at Sandestin to determine how to accomplish the sale of the Club to Ross and Adams. In preparation for the closing of the sale of the Club, Ross and Jordan created a number of corporations to receive title to specific portions of the Club property. These corporations included Over Look Corp. ("Over Look"), Technology Building, Inc. ("Technology Building"), Sand Tops'l Corp. ("Sand Tops'l"), Tops'l Management, Inc. ("TMI"), and Tops'l Beach Property, Inc. ("Tops'l Beach"). Ross served as president and director for TMI and Over Look, secretary and director for Technology Building, and director for Sand Tops'l. Adams was named as a director of TMI. Because the structure of the purchase and sale proved to be more difficult than anticipated, the closing of the transaction did not occur until August 6 and 7.

The final agreement was complicated. Pursuant to an agreement titled Partial Assignment of Contract Rights ("Partial Assignment"), the Club property was divided into four general classes of property: (1) condominiums; (2) the amenities including inter alia a retail/office building, restaurant, tennis courts, pool house, and all personal property located in or used in connection with the various facilities, and all attendant contract rights, licenses and permits; (3) the developer rights; and (4) the undeveloped parcels 628 and 630. L'Spot transferred its right to acquire the condominium property to Over Look, Technology Building, and Sand Tops'l. L'Spot transferred its

right to acquire, the amenities, the developer rights, and the undeveloped parcels 628 and 630 to TMI.

In exchange for the transfer of the acquisition rights, Over Look, Technology Building, and Sand Tops'l each agreed to pay approximately one third of the purchase price for the Club. MWL loaned $2,000,000 to each of the three corporations so that they could purchase their share of the Club pursuant to the Partial Assignment and use the balance for working capital. The terms of the three loans were identical. They were secured by a mortgage on the portion of the property purchased by each corporation. Each loan also had as collateral a portion of the property rights transferred to TMI under the Partial Assignment.[2]

Thus, payment for the $6,000,000 loaned by MWL for the acquisition of the Club was assumed by Over Look, Technology Building, and Sand Tops'l. TMI assumed L'Spot's responsibility to pay $5,000,000 to MWL for the right to purchase the Club. As further consideration, TMI granted MWL a seven year option to acquire a two-thirds interest in parcels 628 and 630 for one dollar. The Partial Assignment states: "The . . . Option may be

_____

[2]     For example, L'Spot's assignment to Technology Building set forth in the Partial Assignment provides in relevant part as follows:
> Collateral - first mortgage lien on the Technology Assets <u>as well as a lien to be granted by [TMI] on [TMI's] development rights, general intangibles</u> and management agreement relating to income properties constituting Technology Assets.
(Emphasis added).

-11-

exercised at any time by providing written notice thereof to [TMI] within seven (7) years from the date hereof and by paying, at the closing of such exercise, the sum of One Dollar ($1.00) as the option price thereof."  L'Spot received a similar seven year option to purchase a one third interest in parcels 628 and 630. TMI executed a mortgage and security agreement to secure payment of the $5,000,000 promissory note, which included property that was already pledged as security for the loans totaling $6,000,000 for the purchase of the Club.[3] Parcels 628 and 630 were not included in the mortgage agreements.

As a result of these negotiations, the Club property, which was purchased for $5,450,000, was divided into several portions and used to secure promissory notes totaling $11,000,000. Parcels 628 and 630, however, were not included in the property subject to foreclosure upon default.  In addition, these valuable properties could be purchased by MWL and L'Spot for an option price that totalled two dollars.  Furthermore, notwithstanding the fact that the purchase for the Club was $5,450,000, the four corporations signed promissory notes and mortgage agreements totaling $11,000,000:  $6,000,000 for the purchase money for the Club and working capital, and $5,000,000 for the assignment of

_____

[3]     L'Spot's assignment to TMI set forth in the Partial Assignment provides in relevant part, "[TMI] shall grant to Lender a first mortgage lien upon and a security interest in all of the operating properties, the General Intangibles and Developer's Rights."  (Emphasis added).

-12-

MWL's right to purchase the Club. As discussed above, the acquisition and contemporaneous sale by MWL of On Line's right to purchase the Club was done for the sole purpose of making it appear that MWL had an asset worth $5,000,000 on its June 30, 1990 statement to the regulators.

Immediately following the sale, Ross opened a bank account for TMI in the AmSouth Bank of Florida ("the TMI account"). He also created a cash management account for L'Spot with Merrill Lynch Gulfpost/Biloxi ("the L'Spot account"). After the purchase of the Club, and the payment of closing costs, $205,000 remained from the money MWL loaned to the three corporations. Shamburger, acting on behalf of MWL, agreed to deposit the $205,000 in the TMI account for "operating expenses."

On August 31, 1990, a condominium owned by the Club was sold by TMI for $250,844.77. The condominium was part of the security for the purchase price loan. Instead of using the proceeds of the sale to reduce the outstanding balance on the purchase price loan, Ross, with the consent of Shamburger and Jackson, deposited the money in the TMI account as "operating expenses." Later that day, Ross transferred $200,000 from the TMI account to the L'Spot account. On September 1, 1990, Ross transferred an additional $245,000 to the L'Spot account.

On September 26, 1990, Ross withdrew $150,000 from the L'Spot account and deposited it in his separate personal account at Merrill Lynch. On the same date, Ross executed six checks on

-13-

his personal Merrill Lynch account payable to himself for a total of $119,000. Two of these checks totalling $96,500 were endorsed by Ross and deposited in Adams' account at Merchants and Marine Bank. On October 2 and October 19, 1990, Ross drew two more checks totaling $32,600 on his personal Merrill Lynch account and deposited them into his account at Jefferson Bank.

In early October 1990, Ross, acting on behalf of TMI, asked GNL to approve a $3,000,000 "construction/operating" loan for the Club. GNL was in serious financial trouble at this time. It was desirous of disposing of the Ensley Shopping Center. O'Keefe, president of GNL, informed Ross and Adams that he would approve a loan to TMI of $3,000,000 if they would purchase the Ensley Shopping Center from GNL. To satisfy O'Keefe's counter proposal, Adams caused articles of incorporation to be filed for the Northgate Corporation of Sandestin ("Northgate"). Adams was the only director of Northgate. Dunston was designated its president and secretary. Its sole purpose was to acquire the shopping center.

GNL retained Florida attorneys Richard Powell and Fred Estergren to handle the loan to TMI and the sale of the Ensley Shopping Center to Northgate. By this time, the Resolution Trust Corporation had taken control of Charter Bank. Charter Bank held a mortgage on the Ensley Shopping Center as security for its $2,000,000 loan to MWL. Powell became concerned regarding whether it was necessary to inform Charter Bank that GNL was

-14-

planning to sell the Ensley Shopping Center to another party because Charter Bank held the mortgage on this property. Michael Cavanaugh, GNL's attorney, sent a facsimile to Estergren on October 19, 1990, informing him that the mortgage did not contain a due-on-sale clause. Accordingly, Estergren did not notify the Resolution Trust Corporation or Charter Bank of the proposed sale of the Ensley Shopping Center to Northgate.

Dunston, Ross, Cavanaugh, Jordan, Estergren, and Powell met on October 30, 1990 to consummate GNL's loan of $3,000,000 to TMI, and the sale of the Ensley Shopping Center by GNL to Northgate. GNL sold the Ensley Shopping Center to Northgate for $4,100,000. As payment to GNL for the acquisition of the Ensley Shopping Center, Northgate assumed GNL's obligation to pay Charter Bank $1,972,650.29, which was owing on the promissory note executed by GNL in favor of Charter Bank. Northgate also executed a promissory note for $1,127,349.31, secured by all of Northgate's outstanding stock,[4] and a second purchase money mortgage. In addition, Northgate promised to pay GNL $1,000,000 in cash, no later than October 30, 1990. The agreement to purchase the Ensley Shopping Center was signed by Adams on behalf of Northgate.

On the same date, GNL agreed to loan TMI $3,000,000 based on Ross's representation that the money would be used for the Club's

---

[4]     The record shows that Northgate's stock had no value at this time.

operating and maintenance expenses.  One million five hundred thousand dollars of the loan was secured by mortgages on parcels 628 and 630, which had been previously left free of debt.  The money was disbursed as follows:  First, GNL set up a reserve fund for TMI of $1,000,000.  Second, GNL endorsed five checks to TMI from different sources totalling $1,040,000.  These checks were deposited in the TMI account.  Third, GNL also delivered a check for $1,000,000 to TMI drawn on its account at the People's Bank in Biloxi, Mississippi.  On October 30, 1990, the date this check was issued by GNL, GNL had a total of $41,500.64 in its account at the People's Bank.  On the same date, TMI endorsed the $1,000.000 check to Northgate.  Northgate then endorsed the same check back to GNL.  Thus, Northgate ostensibly met its obligation to pay $1,000,000 in cash to GNL as partial payment for the purchase of the Ensley Shopping Center by presenting to GNL the same check that GNL had issued to TMI with insufficient funds. As a result of this sleight of hand, GNL's bank account showed a credit of $1,000,000 on November 1, 1990.

On October 30, 1990, $1,000,000 was transferred by wire from TMI account to the L'Spot account.  Immediately after this transfer, Ross issued several checks on the L'Spot account.  A check in the amount of $499,999.99 was issued to Adams. Shamburger received a check for $333,333.33.  Ross also made out a check in the amount of $166,666.66 to himself.  Adams, Shamburger and Ross deposited the checks into their personal bank

accounts. Jane Masholie, a GNL employee, testified that she typed these checks at Ross's direction during the closing of GNL's loan to TMI.

Ross became a consultant for GNL in January, 1991. On January 18 and January 22, 1991, Ross issued four checks to TMI totaling $550,000 from the $1,000,000 TMI reserve fund, which was created as part of GNL's loan to TMI. Ross then endorsed each of the checks as president of TMI for deposit in the L'Spot account. On January 22, Ross issued a check to L'Spot in the amount of $100,000, a check for $183,333.33 to Jackson, $183,333.33 to Shamburger, $41,666.50 to Adams, and $41,666.50 to himself. The $100,000 check payable to L'Spot was used to acquire a certificate of deposit. It was redeemed, endorsed by Ross, and deposited in a bank account opened in the name of Casino Beach.

In late January, 1991, Ross instructed Ms. Masholie to draft several promissory notes payable to the order of L'Spot and to back date them so as to make it appear that they were executed on the dates that checks had been issued on the L'Spot account. A $150,000 promissory note dated September 26, 1990 was signed by Ross, which provided that he would pay L'Spot interest at a rate of prime rate floating per annum until paid and payable on demand. A promissory note for $166,666.66, dated October 10, 1990, was also signed by Ross. Ms. Masholie testified that she made a typographical error in using October 10, 1990 as the date the note was executed; Ross had instructed her to use October 30,

1990. Another note dated October 10, 1990 in the amount of $166,666.66 was signed by Adams. Shamburger signed a promissory note for $333,333.33, which was backdated to October 30, 1990. A note for the same amount, also backdated to October 30, 1990, was prepared for Jackson, however, it was not signed.

Ms. Masholie prepared a second set of promissory notes at Ross's direction in late January 1991 . Each was dated January 24, 1991. She was told that the amounts should match earlier disbursements from the L'Spot account. Jackson and Shamburger each signed notes in the amount of $183,333.33. Ross and Adams each signed notes in the amount of $41,666.50.

Ms. Masholie also testified that she drafted a promissory note from Northgate to L'Spot in the amount of $1,000,000. The note bears the date October 30, 1990. It was not prepared by Ms. Masholie until approximately one year after October 30, 1990.

On May 14, 1991, Dunston, acting on behalf of TMI, requested that MWL waive the restrictions on the use of the money loaned to TMI on August 6, 1990 for the purchase of the Club. The letter reads as follows:

> Please accept this letter as a request for
> written waiver of the loan covenants
> specified below which are contained in the
> loan agreement between TOPS'L Management,
> Inc. and Midwest Life Insurance Company dated
> August 6, 1990. This waiver will serve to

-18-

> document your prior verbal waiver of these
> covenants.
>
> Section IV, Negative Covenants, Item E,
> "Loans to Others and Investments" prohibits
> transaction with affiliates  unless approved
> in advance by the Payee (Midwest Life).  At
> December 31, 1990, TOPS'L Management has
> outstanding advances to L'Spot Corporation,
> its parent company, of $2,195,000.  In
> addition, TOPS'L Management has obligations
> totaling approximately $802,222 due to Sand
> TOPS'L Corp, Overlook Corporation and
> Technology Building, Inc., affiliates,
> resulting from the purchase of TOPS'L Beach
> and Racquet Club.  These transactions appear
> to be violations of the above covenants.
>
> Please indicate your acceptance of the waiver
> request by signing below.  Thank you for your
> cooperation and assistance.

The waiver request was granted on June 3, 1991.

Ross received a total of $240,933.16 for his personal benefit from the money loaned to TMI by MWL and GNL for the purchase and operation of the Club.  Adams received $660,666.49. As of the time of trial, neither of them had paid any taxes on these amounts, nor had they repaid the amounts reflected on the backdated promissory notes.

Ross and Adams assert that the Government failed to prove that they committed any crime.  They argue that the evidence shows, instead, that they were involved in complex, but lawful financial transactions.

## B.  Analysis

### COUNT I -- CONSPIRACY

We begin our analysis of the sufficiency of the evidence in the conspiracy count ("Count I") by examining the theory of the prosecution in alleging that Ross and Adams were guilty of conspiracy.  "This Court cannot affirm a criminal conviction based on a theory not contained in the indictment or not presented to the jury."  United States v. Elkins, 885 F.2d 775, 782 (11th Cir. 1989), cert. denied, 495 U.S. 1005 (1990) (citation omitted).

Count I alleged a conspiracy among Ross, Adams, Jordan, Dunston, and others to commit the substantive offenses of mail fraud, wire fraud, interstate transportation of property taken by fraud, and money laundering in order to further a scheme to defraud MWL, GNL, Charter Bank, and the states of Mississippi, Florida, and Louisiana.  The indictment alleged that the defendants' fraudulent scheme included the following objects:

> It was the defendants' objective to fraudulently divert loan funds from their intended purposes and thereafter convert these stolen funds to the use and benefit of the defendants, to include an investment in a Mississippi project to develop a gambling casino, without disclosing to the regulatory agencies the fact that the funds had been diverted.

> It was further the defendants' objective to create a scheme to defraud the people of the States of Florida, Louisiana, and Mississippi, and Charter Bank, by using the funds illegally obtained from Midwest Life Insurance Company (Midwest) and Gulf National Life Insurance Company (Gulf National Life) to invest in speculative investments which normally would not have been approved as admissible assets for these companies by the Insurance Commissions of these

various states without properly disclosing the close and affiliated relationships between the true borrowers and the principal lending officials for these companies.

Thus, the Government's theory of prosecution was that Ross and Adams conspired to induce two state regulated insurance companies to loan money by fraudulently representing that it was solely to be used for a legitimate business purpose, without disclosing their intent to divert some of these funds for their personal use and benefit. The indictment also alleges that a further object of the conspirators was to falsify insurance company records to cover up their fraud so as to avoid detection by state insurance regulators.

Having identified the government's theory of prosecution, we must next discuss the sufficiency of the evidence of a conspiracy. Participation in a conspiracy to commit a crime may be inferred from circumstantial evidence. See United States v. Delgado, 903 F.2d 1495, 1500 (11th Cir. 1990) cert. denied, 498 U.S. 1028 (1991). "[C]onspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself." Ingram v. United States, 360 U.S. 672, 678 (1959) (internal quotation marks and citation omitted) (alteration in original). To establish a conspiracy to commit wire fraud, the government must prove (1) an agreement between two or more persons (2) to execute a scheme to defraud and (3) the use of either the mails

-21-

or wire service in furtherance of the scheme.  See <u>United States</u> <u>v. Simon</u>, 839 F.2d  1461, 1469 (11th Cir. 1988).  Proof of specific intent to use the mails or wire service is not required to show conspiracy to commit mail or wire fraud.  See <u>United</u> <u>States v. Massey</u>, 827 F.2d 995, 1001-02 (5th Cir. 1987).  Rather, "[t]he government's burden . . . is to demonstrate beyond a reasonable doubt that [the defendants] agreed to engage in a scheme to defraud in which they contemplated that the mails [or wire service] would likely be used."  <u>Id.</u> at 1002.

There is no dispute regarding the fact that Ross and Adams entered into an agreement with MWL and GNL through their corporate alter egos to obtain loans for business purposes that were subsequently diverted to their personal use and benefit. Ross and Adams argue that they committed no crime because there was no restriction on the use of the GNL loan and MWL expressly waived all earlier violations of the loan agreement on June 3, 1991.

In his opening brief, Adams argues that the Government's assertion that there were "intended purposes" for the loans made by GNL and MWL to the corporations controlled by Ross and Adams is inaccurate.  The record is to the contrary.

The Government presented evidence that TMI obtained a $3,000,000 loan from GNL on October 30, 1990 for the specific purpose of paying for the cost of repairs and the operation of the Club.  The purpose of MWL's loan to L'Spot is clearly

reflected in the commitment letter executed by Jackson on May 1, 1990, as chairman of the board of MWL. The commitment letter states in pertinent part: "Midwest Life shall lend Five Million Five Hundred Thousand ($5,500,000.00) Dollars to be used to purchase Tops'l Beach and Racquet Club residential/recreational development." The record shows that on August 6, 1990, Over Look, Technology Building, and Sand Tops'L received loans from MWL totalling $6,000,000 for the purchase of the Club and working capital.

Alternatively, Adams maintains that, "even if there was an agreement about the `intended purposes' of the loan that was breached by Adams or others, the remedy is civil litigation. Adams asserts that [t]here is nothing in the law stating that this sort of thing would be a criminal felony." Adams Br. at 16. To support this proposition, Adams refers us to United States v. Kristofic, 847 F.2d 1295 (7th Cir. 1988).

A careful reading of the Kristofic decision will readily demonstrate that Adams's reliance on it in his challenge to the sufficiency of the evidence is misplaced. Kristofic was convicted of converting to her use "a thing of value of the United States" in violation of 18 U.S.C. § 641. Id. at 1295-96. The evidence produced at Kristofic's trial demonstrated that she received a loan of $60,000 from the Small Business Administration for leasehold improvements, new equipment, and capital for a restaurant she had opened the previous year in Chicago.

Kristofic certified that she would use the loan proceeds according to the provisions of the loan agreement. See id. at 1296. Less than a month after she received the loan, Kristofic closed the restaurant. None of the funds were put to their intended use. Instead, she paid pre-existing debts, made a down payment on a car, made a personal loan of $12,000 to a friend, invested money in a bar in Texas, and kept $3,000 in cash. See id. The Seventh Circuit reversed the judgment in Kristofic. The court held that the Government failed to prove that the defendant converted a thing of value of the United States. The court reasoned that "loan proceeds do not remain the property of the lender." Id. Therefore "Kristofic's misapplication of the funds was not a conversion because the government no longer held a property interest in them." Id. at 1297. The Seventh Circuit's opinion in Kristofic is not applicable to any of the issues in this case because Ross and Adams were not prosecuted for conversion. They were prosecuted for fraudulently representing to MWL and GNL that their corporations intended to use the loan proceeds for specific business purposes without disclosing their intention to divert some of the money for their personal benefit. Thus, unlike the situation in Kristofic, the crimes committed by Ross and Adams were completed at the time they made fraudulent representations and failed to disclose material facts in order to induce MWL and GNL to make the loans.

Following oral argument, Adams filed a letter with the clerk

-24-

of this court in which he advances an additional argument based on his reading of the Fifth Circuit's opinion in United States v. Grossman, 117 F.3d 255 (5th Cir. 1997). In Grossman, the defendant was convicted of conspiracy to commit wire fraud and eleven counts of wire fraud. Grossman obtained several loans from a savings and loan association in order to purchase a real estate development known as "the Oaks." The loans contained the following language: "Borrower represents and warrants lender that the loan will be used by borrower for its business and commercial purposes and not for personal, family, household or agricultural use." Id. at 259.

The Government contended at trial that Grossman violated this clause because he used the loan proceeds for business purposes unrelated to the business entity named on the loan. See id. Grossman argued that he was not guilty of fraudulently using the loan proceeds because the language in the clause allowed him to use it for business purposes related to any of his real estate holdings. See id. at 260. The Fifth Circuit held that Grossman's interpretation of the clause was reasonable, although not the only possible interpretation, and stated that "the alleged breach of this clause does not support a finding of fraudulent intent on the part of Michael Grossman." Id.

Adams contends that appellants' interpretation of the loan agreements that they could use the loan proceeds for their personal benefit was a reasonable interpretation of the loan

-25-

agreements. This argument finds no support in the record. The intended purpose for the loans made by MWL and GNL is free from any ambiguity. MWL loaned three corporations $6,000,000 for the purchase of the Club and working capital. GNL loaned TMI $3,000,000 to pay for repairs and operating expenses of the Club. MWL and GNL did not loan any money to Ross or Adams, nor did either company authorize the three corporations or TMI to make a personal loan to Ross or Adams.

Appellants appear to argue that the failure of GNL expressly to prohibit the diversion of loan funds obtained for enumerated business purposes justifies their failure to disclose that they intended to use the money for their personal benefit. Appellants have not cited any authority for this bold proposition. We reject it as frivolous.

Appellants concede that the diversion for their personal benefit of money loaned by MWL for the purchase of the Club violated restrictions contained in the written loan agreement. They maintain, however, that the subsequent waiver of the violation of the loan agreement immunizes them from prosecution for their conduct and the failure to disclose their fraudulent intent in applying for the loan. This argument ignores the fact that the fraud was accomplished and the money was diverted approximately eight months before the waiver was obtained. Ratification or condonation is not a defense for past criminal behavior. See Gilbert v. United States, 359 F.2d 285, 287 (9th

-26-

Cir. 1966); 1 Charles E. Torcia, Wharton's Criminal Law § 45 (15th ed. 1993).

The evidence, viewed in the light most favorable to the Government, was sufficient to persuade a rational juror beyond a reasonable doubt that Ross and Adams conspired to induce GNL and MWL to loan money for business investments without disclosing their intent to divert funds for their personal use and benefit. This conduct threatened the interests of the policy holders and deliberately interfered with the ability of the state insurance commissioners to regulate the activities of these companies and deter a use of their assets that would jeopardize their solvency.

The record shows that in March 1990 Ross entered into an agreement with Shamburger and Jackson to disguise from insurance regulators the purchase by MWL of first mortgage loans from a related company. To carry out this deception, On Line, a shell corporation, was created. Ross, as the president of On Line, purchased the first mortgage loans from a bank account opened and funded by Shamburger and Jackson, and then assigned the loans to MWL. Ross was paid $20,000 for writing a check, in his capacity as the president of On Line, to purchase the loans and executing an assignment of the loans to MWL.

A rational juror could also infer from the evidence that Ross and Adams conspired with Shamburger and Jackson to conceal from state insurance regulators the fact that MWL had a deficit of $2,300,000 for the second quarter of 1990. This deception was

accomplished by using On Line as a conduit to effect transfer of THI's right to purchase the Club to MWL. First, THI assigned the Club purchase agreement to On Line. Then, Ross, as president of On Line, assigned the Club purchase agreement to MWL for no consideration. MWL, in turn, assigned the Club purchase agreement to L'Spot. Ross, as president of L'Spot, executed a $5,000,000 promissory note in exchange for MWL's interest in the Club purchase agreement. L'Spot's promissory note was entered as a $5,000,000 asset in MWL's second quarterly report even though it was not executed until August 6, 1990, approximately five weeks after the second quarter had ended. Thus, instead of reporting a $2,300,000 loss, this sham transaction permitted MWL to report a profit of $2,700,000.

Ross and Adams participated in similar trickery to disguise GNL's fragile financial condition while at the same time negotiating a $3,000,000 loan for the Club's construction and operating expenses. As discussed above, GNL promised to loan TMI $3,000,000 if Ross and Adams would purchase the Ensley Shopping Center for $4,100,000. Ross and Adams created Northgate for this purpose. Adams was its sole director. In payment for the Ensley Shopping Center, Northgate assumed GNL's obligation to pay the remaining balance of $1,972,650.69 owed by GNL to Charter Bank for its 1989 acquisition of the Ensley Shopping Center, executed a promissory note for $1,127,349.31 in favor of GNL, and endorsed and handed to GNL's representative the same $1,000,000 check that

-28-

GNL had issued to TMI as part of GNL's $3,000,000 loan to TMI. This transaction created the illusion that GNL sold a shopping center for $4,100,000 that it had purchased the previous year for $4,000,000 from Charter Bank. In fact, GNL received a worthless check with a face value of $1,000,000; a promissory note for $1,127,349.31 secured by all of Northgate's outstanding stock, which had no value on October 30, 1990; and a second mortgage on the Ensley Shopping Center. Based on all the evidence presented by the Government concerning the conduct of Ross and Adams, a rational juror could be persuaded beyond a reasonable doubt that Ross and Adams agreed to the purchase of Ensley Shopping Center to assist O'Keefe in his efforts to mask GNL's perilous financial condition from policy holders and insurance company regulators and to strip GNL of approximately $1,000,000 for their personal use and benefit.

The evidence outlined above demonstrates that Ross and Adams perpetrated a fraud by withholding material facts regarding their intention to use for their personal use and benefit money loaned for business purposes. The evidence is also sufficient to demonstrate that a wire transmission was used to accomplish their fraudulent scheme to withhold from the Charter Bank and the Resolution Trust Corporation material facts that may have alerted them to take action to prevent use of the Ensley Shopping Center as a pawn in their scheme to obtain $1,000,000 from GNL for their personal use and benefit. We later discuss the sufficiency of

the evidence to commit the substantive offense of wire fraud.

Ross and Adams also contend that the evidence is insufficient to persuade a rational juror that the defendants conspired to commit the offense of interstate transportation of money taken by fraud. We discuss below appellants' challenge to the sufficiency of the evidence to support their conviction of the substantive offense of interstate transportation of money taken by fraud. Our determination that the evidence was sufficient to satisfy a rational juror beyond a reasonable doubt that Ross and Adams committed the crime of interstate transportation of money by fraud answers their contention that the evidence was insufficient that this crime was an object of their conspiracy.

We are persuaded that the evidence was sufficient to persuade a rational trier of fact beyond a reasonable doubt that Ross and Adams conspired to commit the crimes of wire fraud and interstate transportation of money taken by fraud. We need not consider whether the evidence is sufficient to support a judgment of conviction for conspiring to commit the crime of money laundering. A guilty verdict in a multi-object conspiracy will be upheld if  the evidence is sufficient to support a conviction of any of the alleged objects. See Griffin v. United States, 502 U.S. 46, 56-60 (1991).

COUNT VI -- WIRE FRAUD

Ross and Adams also challenge the sufficiency of the evidence that they committed the crime of wire fraud as alleged in Count VI of the indictment. They argue that the facsimile from Michael Cavanaugh, GNL's legal counsel, to Fred Estergren, who represented GNL in closing the Ensley Shopping Center sale to Northgate, is insufficient to constitute wire fraud because there is no evidence in the record that it was sent in furtherance of a fraudulent scheme.

Count VI reads as follows:

1. From on or about November 1, 1989 and continuously thereafter up to and including the date of this indictment, the defendants, KENNETH D. ROSS, JAMES H. ADAMS, OSCAR JORDAN, and RONALD DUNSTON, along with others, knowingly and willfully devised a scheme to defraud, or for obtaining money or property by means of false pretenses and representations or promises well knowing at the time that the pretenses, representations, and promises would be and were false when made, and which scheme and artifice so devised and intended to be devised by the defendants was in substance as described in Count I of this indictment, which description is expressly incorporated herein and made a part hereof as if set forth word by word, line by line.

2. On or about October 19, 1990, in the Northern District of Florida and elsewhere, the defendants, KENNETH D. ROSS, JAMES H. ADAMS, OSCAR JORDAN, and RONALD DUNSTON, for the purpose of execution of the aforementioned scheme and attempting to do so, in furtherance thereof, did knowingly transport and cause to be transmitted by wire in interstate commerce between the State of Mississippi and Destin, Florida, a letter from Michael Cavanaugh to Fred Estergren regarding the Due on sale clause contained in the Charter Bank mortgage, along with this mortgage and promissory note.

In order to establish a violation of § 1343, the government

must prove beyond a reasonable doubt that a defendant "(1) intentionally participated in a scheme to defraud; and (2) used wire communications to further that scheme." United States v. Brown, 40 F.3d 1218, 1221 (11th Cir. 1994). Further, "[e]ach party to a continuing conspiracy may be vicariously liable for substantive criminal offenses committed by a co-conspirator during the course and in furtherance of the conspiracy, notwithstanding the party's non-participation in the offense or lack of knowledge thereof." United States v. Mothersill, 87 F.3d 1214, 1218 (11th Cir.), cert. denied sub nom. ___ U.S. ___, 117 S. Ct. 531, 136 L. Ed. 2d. 416 (1996). "[A] court need not assess the individual culpability of a particular conspirator provided the `substantive crime was a reasonably foreseeable consequence of the conspiracy.'" Id. (quoting United States v. Alvarez, 755 F.2d 830, 849-50 (11th Cir. 1985).

A rational juror could infer beyond a reasonable doubt that Ross and Adams intentionally participated in a scheme to defraud the policy holders of GNL by falsely representing that TMI required a loan of $3,000,000 to fund operational expenses without disclosing that their true intent was to divert approximately $1,000,000 for their personal use and benefit on the same date the business loan to TMI was consummated. To carry out their scheme, Ross and Adams agreed to purchase the Ensley Shopping Center from GNL. Because Ross was the chief executive officer of Charter Bank in 1989 when GNL purchased the Ensley

Shopping Center from Charter Bank, he was aware that Charter Bank held a mortgage on that property. Ross was also aware that Charter Bank had failed in March 1990 and had been taken over by the Resolution Trust Company. Nevertheless, he and Adams did not notify Charter Bank or the Resolution Trust Corporation that GNL intended to convey the Ensley Shopping Center to Northgate, Adams's alter ego corporation.

Ross retained Florida attorneys Richard Powell and Fred Estergren to close the loan to TMI. Powell and Estergren discovered in their title search that Charter Bank held a mortgage on the Ensley Shopping Center. Estergren drafted a document entitled "Consent to Sale" for Charter Bank's signature. It provided that for a consideration of $10, Charter Bank consented to the sale of the Ensley Shopping Center to Northgate. The proposed agreement also noted that GNL would remain liable to Charter Bank pursuant to its promissory note and the mortgage. Estergren consulted with Michael F. Cavanaugh, a GNL board member and its chief counsel, for his opinion regarding whether Charter Bank should be notified of the proposed sale of the Ensley Shopping Center because of the fact that it held the first mortgage on that property. Cavanaugh sent a facsimile memorandum from his Mississippi office, which stated: "I am forwarding the current Mortgage on the Ensley Property. I do not find a `due on sale provision'. Under Florida law could we sell the property as an Assumption and not trigger the due on sale."

Estergren testified that Cavanaugh's memorandum persuaded him that he should "forget" about providing Charter Bank or the Resolution Trust Corporation with notice of the proposed sale of the Ensley Shopping Center.  Accordingly, the Consent to Sale document was not sent to Charter Bank.

Ross and Adams argue that Cavanaugh's fax cannot be the basis for a conviction under § 1343 because its contents were not fraudulent or untrue.  The Supreme Court, however, has rejected an identical argument in the mail fraud context.  In Schmuck v. United States, 489 U.S. 705 (1989), the Court stated that even "`innocent' mailings--ones that contain no false information--may supply the mailing element."  Id. at 715 (quoting Parr v. United States, 363 U.S. 370, 390 (1960)).  The defendants' conviction under the wire fraud statute is subject to the same analysis.  See Carpenter v. United States, 484 U.S. 19, 25 n.6 (1987) ("The mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here.").  Therefore, the fact that the facsimile memorandum may have been correct that the Charter Bank mortgage did not have a due-on-sale clause did not prevent the jury from concluding that Cavanaugh's fax to Estergren furthered the fraudulent scheme.  Had Charter Bank or the Resolution Trust Corporation been notified of the proposed sale of Ensley Shopping Center, they may have been able to take action to prevent it.

Ross and Adams also argue that they were not aware that

-34-

Cavanaugh had wired the memorandum to Powell and Estergren. "Where one does an act with knowledge that the use of the [interstate wires] will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he `causes' the [interstate wires] to be used." Pereira v. United States, 347 U.S. 1, 8-9 (1954). Ross and Adams incorporated Northgate in Florida. GNL was a Mississippi corporation. It was clearly foreseeable that a transaction between corporations in two states would involve interstate wire transfers.

Finally, Ross urges us to reverse his wire fraud conviction because "the government failed to prove that the actions of Mr. Ross and the other named defendants caused any defrauding in that a victim lost any money or property." Ross Br. at 19. He further states there was "absolutely no evidence that Charter Bank lost anything as a result of the wire fraud or the `Ensley' real estate transaction between Gulf National Life Ins. Co. and Northgate Corporation of Sandestin, Inc." Id. at 20. This argument lacks merit. Punishment under the wire fraud statute is not limited to successful schemes. "A scheme to defraud need not be carried out to constitute a violation of the mail and wire fraud statutes. These statutes punish unexecuted, as well as executed, schemes." Pelletier v. Zweifel, 921 F.2d 1465, 1498 (11th Cir. 1991); see United States v. Patterson, 528 F.2d 1037, 1041 (5th Cir. 1976) ("[t]here is no necessity for the government

to prove actual financial loss").  The Government merely needs to show that the accused intended to defraud his victim and that his or her communications were "`reasonably calculated to deceive persons of ordinary prudence and comprehension.'"  Pelletier, 921 F.2d at 1498-99 (quoting United States v. Bruce, 488 F.2d 1224, 1229 (5th Cir. 1973)).  The record demonstrates that the Government satisfied this burden as to both defendants.

We conclude from our review of the evidence that it is sufficient to persuade a rational juror beyond a reasonable doubt that Ross and Adams knowingly caused a facsimile memorandum to be transmitted by wire between the states of Mississippi and Florida to further their scheme to defraud GNL's policy holders by diverting money loaned for business purposes for their personal use without alerting the Resolution Trust Corporation that the Ensley Shopping Center was being sold to a straw corporation controlled by Adams.

COUNT VII -- INTERSTATE TRANSPORTATION OF STOLEN PROPERTY

Ross and Adams also challenge the sufficiency of the evidence to support their conviction of transferring more than $5,000 in interstate commerce.  Count VII states:

> On or about October 30, 1990, in the Northern District of Florida and elsewhere, the defendants, KENNETH D. ROSS, JAMES H. ADAMS, OSCAR JORDAN, and RONALD DUNSTON, did knowingly and willfully transport and cause to be transported in interstate commerce between Destin, Florida, and the State of Mississippi, goods, securities, or money, to-wit: funds in
> the amount of One Million dollars ($1,000,000.00), knowing the same to have been stolen, converted and taken by fraud.

-36-

"A conviction under 18 U.S.C. § 2314 requires `(1) knowledge that certain property has been stolen or obtained by fraud, and (2) transporting it, or causing it to be transported, in interstate commerce." United States v. Hartley, 678 F.2d 961, 986 (11th Cir. 1982) (quoting Pereira v. United States, 347 U.S. 1, 9 (1953)).

Ross and Adams assert that this count was impermissibly vague because there were two separate transfers between Florida and Mississippi on October 30, 1990 involving funds in the amount of $1,000,000. They contend that it is unclear whether Count VII referred to the unfunded check for $1,000,000 provided by GNL to TMI and endorsed back to GNL or the $1,000,000 TMI received from GNL at the loan closing. The defendants did not object to the vagueness of Count VII at trial. When there has not been a prior objection to the form of the indictment, we will review a challenge to the indictment only for clear and prejudicial error. See United States v. Harrell, 737 F.2d 971, 981-82 (11th Cir. 1984).

After reviewing the record, we conclude that Count VII was not impermissibly vague and that its general description of the crime did not cause any prejudice to the defendants. During closing arguments, the Government stated that the basis for the interstate transportation of stolen property charge was the money that GNL deposited in the TMI account following the loan closing

on October 30, 1990.  The Government argued:

> The funds are put in the Tops'l Management account for
> Tops'l's operating purposes - for Tops'l's operating
> purposes.  They're immediately transferred from the AmSouth
> Florida bank account, Tops'l, to the L'Spot account in
> Mississippi.  That's one of the crimes, interstate
> transportation and money laundering.

Ross's counsel agreed with the Government that the basis for

Count VII was the $1,000,000 TMI received at the loan closing.

During Ross's closing argument, he stated:

> Count VII charges that the defendants moved in interstate
> commerce $1,000,000 to Tops'l Management.  . . . .  That
> when this money from Gulf National as a result of that
> October 30    closing - you remember, there were five
> checks that Mr.
> Cavanaugh from Gulf National brought to the closing at Fort
> Walton, and he gave those five checks to Mr. Ross and they
> were deposited in the Tops'l Management account in Destin.
> And the government alleges that right there, that was stolen
> property - that was stolen property.  And I believed I
> understood that the government's theory for taking that
> position that this was stolen property was because
> representations apparently were made that the purpose of the
> loan was supposed to be to make improvement, but that, they
> used the money for different purposes.

This is the only logical interpretation of Count VII.  Count VII

clearly identifies "funds in the amount of One Million Dollars"

as the property transported through interstate commerce by the

Ross and Adams.  The defense did not have any difficulty at trial

discerning the nature of the allegations in Count VII.  It is

clear that Count VII referred to the $1,040,000 deposited in

TMI's account and not to the insufficient funds check that was endorsed back to GNL.

Having concluded that Count VII is not impermissibly vague or ambiguous, we must also consider whether the evidence presented to the jury was sufficient to persuade a rational jury beyond a reasonable doubt that Ross and Adams violated § 2314 by causing the $1,000,000 in loan funds to be transported from Florida to Mississippi. As discussed above in our analysis of the sufficiency of the evidence to support the conspiracy count, the Government demonstrated that Ross knew these funds were obtained by fraud. There was testimony that Ross represented that the $3,000,000 was for the Club's operating expenses. Ross transferred $1,000,000 to himself, Adams, and Shamburger on the same date that they were deposited by GNL into TMI's account in Florida. Ross's act of diverting the GNL loan funds from their intended purpose clearly furthered the conspiracy. As a co-conspirator, Adams was liable for any substantive offense committed by Ross in furtherance of the conspiracy to defraud the insurance companies, its policy holders, and the state insurance regulators. See United States v. Mothersill, 87 F.3d 1214, 1218 (11th Cir.) cert. denied sub nom. ___ U.S. ___, 117 S. Ct. 531, 136 L. Ed. 2d 416 (1996).

## EXCLUSION OF EVIDENCE OFFERED BY ADAMS

Adams maintains that the district court erred in excluding three defense exhibits designated as "Adams 7," "Adams 11," and "Adams 12," which were offered to prove that MWL and GNL did not lose any money as a result of the loans they made to the corporations controlled by Ross and Adams. This court reviews a district court's evidentiary rulings for "a clear abuse of discretion." United States v. Sellers, 906 F.2d 597, 601 (11th Cir. 1990).

Adams 7 included all records of the sales of the Club property. It showed that MWL received $8,700,000 from the sale of property that served as security for the money loaned to Overlook, Technology Building, and Sand Tops'l for the purchase and operation of the Club. Adams 11 contained an appraisal of the Ensley Shopping Center. Adams 12 showed that GNL sold parcels 628 and 630 for $3,700,000 on September 30, 1994. Adams contends that these exhibits tend to prove that he did not intend to steal, convert, or take any money by fraud.

The district court did not abuse its discretion in denying admission of these exhibits into evidence. Ross and Adams committed fraud by diverting for their personal use and benefit money that was loaned for business purposes to TMI, Overlook, Technology Building, and Sand Tops'l. MWL and GNL did not loan any money to Ross and Adams. Ross and Adams did not furnish any

security for the money they obtained by diverting funds loaned to the corporations for business purposes. The fact that the property that was used to secure payment of the $3,700,000 business loan may have subsequently appreciated in value is not relevant to the questions whether Ross and Adams falsely represented that the money was to be used for business purposes and whether they failed to disclose that their true intent was to divert the loan proceeds for their personal use and benefit.

III

ALLEGED INSTRUCTIONAL ERROR

A.  Failure to Inform the Jury of the Factual
Allegations in the Indictment

Ross and Adams assert that the district court erred in failing to inform the jury of the factual allegations of each count of the indictment. Adams's counsel requested a theory of defense instruction to the jury. Counsel explained that the proposed instruction was necessary because the jury would receive the prosecution's theory of the case from the indictment. When informed by the court that it did not intend to give the indictment to the jury, Adams's counsel stated that "if the jury did not get the indictment, I would withdraw the theory of defense instruction." The prosecutor informed the court that without receiving a copy of the indictment, the jury would not be able to agree unanimously on which overt act had been proved without being informed about each of the 206 overt acts listed in

-41-

the indictment.  Adams's attorney then suggested that the defense could stipulate that the jury should be instructed that "the parties have agreed that at least one overt act has been proven."  After conferring with the prosecutor, Adams's counsel made the following statement:

> Here's what we propose, Judge, that the indictment not be given to the jury, that the theory of defense instruction be withdrawn, and that we amend the jury instructions under your 4.1 general conspiracy continued, and I've got language written out that Mr. Beard and I and the other defense lawyers have agreed on, if I could come up and show you.

The prosecutor and defense counsel agreed that the court should inform the jury that "the parties agree that an event or transaction occurred which may be considered an overt act, but the defendants disagree that a conspiracy existed."  The district court accepted the agreement.  In accordance with this stipulation, the court did not give the indictment to the jury.

The court's decision to deny the prosecutor's request that the indictment be given to the jury was based on the stipulation of counsel that the indictment should not be given to the jury.  Thus, any error in failing to give the indictment to the jury was invited.  It is "a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party."  Crockett v. Uniroyal, Inc., 772 F.2d 1524, 1530 n.4 (11th Cir. 1985) (citing United States v. Males, 715 F.2d 568, 571 (11th Cir. 1983)).

## B. **Denial of Proposed Instructions**

Ross argues that the court erred in refusing his request that the court instruct the jury that the loan agreement was valid although it was not in writing and that a borrower does not commit a crime if he or she uses the proceeds of a loan for purposes that vary from the terms of the loan agreement. This court reviews a district court's rejection of a proposed jury instruction for abuse of discretion. See United States v. Gonzalez, 975 F.2d 1514, 1571 (11th Cir. 1992).

Ross requested that the court instruct the jury as follows:

> The Court instructs the jury that in order to constitute a loan, there must be a contract whereby, in substance one party transfers to the other a sum of money which that other agrees to repay absolutely, together with such additional sums as may be agreed upon for its use. If such be the intent of the parties, the transaction will be considered a loan without regard to its form. While a note would certainly be evidence of a loan, it is not a prerequisite for the transaction to be a loan.

No issue was raised at trial or in argument that required the court to give this instruction. It was undisputed at trial that MWL and GNL loaned money to four corporations and that the loan agreements were in writing. There was no evidence that any money was loaned to Ross and Adams for their personal use and benefit. The factual question presented to the jury was whether the loans were obtained by fraud.

-43-

Ross also requested the following instruction: "The court instructs the jury that it is not unlawful for a borrower to use loan proceeds for other purposes than those specific purposes expressly made to the lender in order to originally secure the loan." This instruction was patterned after the holding in United States v. Kristofic. As discussed above, the rule announced in Kristofic is not applicable to a case such as this one where the loan was obtained by fraudulent misrepresentations and the withholding of material facts. The district court did not abuse its discretion in rejecting each of these instructions.

## IV. ALLEGED SENTENCING ERRORS

Ross and Adams also challenge the legality of the district court's sentencing decision. They contend that the district court erred as a matter of law in its interpretation and application of the sentencing guidelines. "The question about whether a particular guideline applies to a given set of facts is a question of law, and thus this issue is subject to de novo review." United States v. Shriver, 967 F.2d 572, 574 (11th Cir. 1992) (citation omitted).

The conspiracy charged in Count I of the indictment contained multiple objects. Each object was also alleged as a substantive offense in separate counts. The jury found Ross and Adams guilty of conspiracy to commit mail fraud, wire fraud, interstate transportation of money obtained by fraud, and money laundering. Ross and Adams contend that the district court erred

-45-

in applying the money laundering guidelines in view of the fact that the jury found them not guilty of the substantive money laundering count. They assert that "[g]iven the jury's finding of a substantive offense of wire fraud and of interstate transportation, but not of money laundering, it stands to reason that the conspiracy verdict likely was for conspiring to commit fraud and/or interstate transportation and not for conspiracy to launder money." Adams Br. at 40. It is not surprising that Ross and Adams did not cite any authority for this proposition. It is contrary to well established law. This argument fails to recognize the distinction between the existence of proof necessary to demonstrate a conspiracy to commit a criminal act, such as money laundering, and the evidence that must be produced to sustain a conviction for the substantive offense of money laundering. In <u>United States v. Griffin</u>, 699 F.2d 1102 (11th Cir. 1983), this court held that because the crime of conspiracy is a separate offense, a conviction for conspiracy will stand even if the evidence is insufficient to support a conviction for the substantive offense also pled as an object of the conspiracy. See <u>id.</u> at 1107. Thus, the fact that the jury acquitted Ross and Adams of money laundering does <u>not</u> demonstrate, as argued by Adams, that "the acquittal here on money laundering charges and the conviction for fraud and interstate transportation of stolen property established that the object of the conspiracy was not

-46-

money laundering but fraud and interstate transportation." Adams Reply Br. at 19.

Unfortunately, Ross and Adams did not request that the jury be provided with a special verdict that would have required the jury to specify the objects of the conspiracy Ross and Adams conspired to commit. For that reason, we have no way of determining whether the jury was unanimously persuaded beyond a reasonable doubt that Ross and Adams conspired to commit money laundering.

The jury was properly instructed that the Government was not required to prove that Ross and Adams committed each of the crimes charged as objects of the conspiracy, provided that the jury unanimously agreed on which of the offenses they conspired to commit. The Supreme Court instructed in Griffin v. United States, 502 U.S. 46 (1991), that a general guilty verdict in a multi-object conspiracy will stand even if the evidence is insufficient that the accused conspired to commit one of the objects. See id. at 48-58. Because we have concluded that the evidence is sufficient to demonstrate that Ross and Adams conspired to commit wire fraud, we have affirmed the judgment regarding the conspiracy charge pursuant to Griffin. Griffin does not, however, provide any guidance concerning the applicable sentencing guideline that must be applied in a multi-object conspiracy where the jury's verdict does not specify which offense the defendants conspired to commit. That precise

-47-

question was addressed by this court in <u>United States v. McKinley</u>, 995 F.2d 1020 (11th Cir. 1993). In <u>McKinley</u>, the court framed the issue as follows: "When defendants are convicted on a count charging a conspiracy to commit more than one offense, but the jury's verdict does not specify which of those offenses the defendants conspired to commit, which offense guideline applies at sentencing?" <u>Id.</u> at 1022. This court held that "[t]he Sentencing Guidelines answer this question in § 1B1.2(d), its accompanying commentary and the grouping rules of Chapter 3, Part D." <u>Id.</u>

Section 1B1.2(d) provides: "A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant has been convicted on a separate count of conspiracy for each offense the defendant conspired to commit." U.S.S.G.§ 1B1.2(d). Application Note Five sets forth the sentencing procedure that should be followed when a general verdict is tendered by the jury in a multi-object conspiracy case:

> Particular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit the object offense.

<u>Id.</u> comment (n.5).

In McKinley, this court interpreted the words "were it sitting as a trier of fact" in Application Note 5 to mean "that the court must find beyond a reasonable doubt that the defendant conspired to commit the particular object offense." 995 F.2d at 1026. Ross and Adams argue that we should not follow this court's holding in McKinley that a trial judge should apply § 1B1.1(d) and Application Note 5 under these circumstances because this court did not consider the constitutionality of § 1B1.2(d) and Application Note 5 in that decision. Here, Ross and Adams first presented their constitutional challenge to § 151.2(d) and Application Note 5 during the sentencing proceedings. Ross and Adams's argument can be summarized as follows:

1. Proof that the accused conspired with others to commit an offense is an element of the crime of conspiracy.

2. An accused has a constitutional right to have a jury determine whether the Government has presented sufficient evidence of each element of the crime alleged in the indictment.

3. Where, as here, it is unclear whether the jury was persuaded beyond a reasonable doubt that the accused conspired to commit the crime of money laundering, the Fifth and Sixth Amendments preclude the trial judge from punishing the accused for conspiracy to commit money laundering.

While this court has not previously addressed the question whether § 1B1.2(d) and Application Note 5 deprive a defendant of

rights protected by the Fifth and Sixth Amendments, five circuits have discussed this issue.  We conclude that the reasoning of those circuits that have determined that § 1B1.2(d) and Application Note 5 do not violate the Constitution is more persuasive.

Citing only United States v. Owens, 904 F.2d 411 (8th Cir. 1990), United States v. Garcia, 37 F.3d 1359 (9th Cir. 1994), cert. denied, 514 U.S. 1067 (1995), United States v. Pace, 981 F.2d 1123 (10th Cir. 1992), cert. denied sub nom, 507 U.S. 966 (1993), and United States v. Bush, 70 F.3d 557 (10th Cir. 1995), cert. denied, ___ U.S. ___, 116 S. Ct. 795 (1996), Ross and Adams argue that "the holdings of several circuits, applying the Fifth and Sixth Amendments, would require that the defendant be sentenced on the basis of the conspiracy objective yielding the lowest base offense level."  Adams Br. at 41.

None of the cases cited by Ross and Adams holds that § 1B1.2(d) and Application Note 5 violate the Fifth and Sixth

Amendment.  Two of them do not discuss § 1B1.2(d) and Application Note 5.  A third decision involves a pre-guidelines sentence. The fourth decision contains dictum concerning § 1B1.2(d) that relies on the dictum in the pre-guidelines case.

In <u>United States v. Owens</u>, the appellant was charged in one count with conspiracy to distribute and possess with intent to distribute and attempt to manufacture "methamphetamine/amphetamine."  <u>Id.</u> at 412.  The jury was instructed that "[y]ou must ascertain whether or not the substance in question in this case was in fact methamphetamine/amphetamine."  <u>Id.</u> at 413.  "The jury returned a general verdict of guilty."  <u>Id.</u> at 414.  In the presentence report, the probation officer recommended that "the court determine Owens's offense level on the assumption that the conspiracy's purpose had been to manufacture and distribute methamphetamine."  <u>Id.</u> at 413.  A calculation of the sentence based on an assumption that the controlled substance was amphetamine would have resulted in a sentencing range of 41-51 months.  The range for an equivalent amount of methamphetamine was 63-78 months.  The court found that the conspiracy invoked methamphetamine.  <u>See</u> <u>id.</u>

The Eighth Circuit held that "[b]y instructing the jury on an `either/or' basis with respect to the two substances and by failing to enable the jury to indicate which of the substances it found the conspiracy to have involved, the district court

-51-

elicited an ambiguous verdict of guilty with two possible alternative interpretations." Id. at 415. The court held that "[u]nder the circumstances of this case, the district court erred in sentencing Owens based on the alternative which yielded a higher sentencing range." Id.

The Eighth Circuit did not discuss the constitutionality of § 1B1.2(d) or Application Note 5. Furthermore, there is no indication in the Owens opinion that the district court determined that the evidence was sufficient to persuade it beyond a reasonable doubt that the controlled substance was methamphetamine. In this matter, unlike the situation in Owens, the district court did not give an ambiguous "either/or" instruction to the jury.

In United States v. Garcia, the defendant was charged with conspiracy. The charge alleged five objects of the conspiracy. See 37 F.3d at 1369. Four of the objects involved possession with the intent to distribute cocaine and heroin. In the fifth object of the conspiracy, the indictment alleged that the defendant used a communications facility in committing drug offenses. See id. The jury returned a general verdict of guilty. See id. Thus, the defendant was found guilty of conspiracy to possess heroin and cocaine. The district court imposed a maximum fifteen year sentence on the conspiracy charge based on the allegations that the object of the conspiracy was the possession of heroin and cocaine. See id. The Ninth Circuit

reversed holding that "[i]n the absence of a special verdict, there was no way for the sentencing judge to know which object was the necessary element to constitute the crime." Id. at 1370. In a footnote, the Ninth Circuit stated as follows:

> We note that the sentencing guidelines in section 1B1.2(d) (n.5) state that when the verdict in a multi-object conspiracy does not establish which offense was the object of the conspiracy, the court is to decide the object of the conspiracy. The note specifies that the court can do so "if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense."

> The case at hand is a pre-guidelines case, but we acknowledge that the rationale of this holding casts doubt on the constitutionality of the provision of the sentencing guidelines, because that provision permits a judge rather than the jury to find the facts necessary to establish an element of the crime. The submission of a special verdict form would forestall any such issue.

Id. at 1371 n.4.

The Ninth Circuit's comment in Garcia is clearly obiter dictum since the Sentencing Guidelines were not applicable because the alleged criminal conduct occurred prior to the effective date of the statute. More importantly, the holding in Garcia, that a special verdict is required in a multi-object conspiracy so that the district court can determine which object was the necessary element to constitute the crime, is contrary to the law of this circuit. In McKinley, the district court denied the defendant's motion that the jury be provided with a special

verdict form.  See 995 F.2d at 1023.  In framing the issue regarding the validity of the sentence, this court stated that it would address "the appropriate method for determining the applicable offense guideline for a conviction on a count charging a conspiracy to commit more than one offense when the jury's verdict does not establish which of these offenses were objects of the conspiracy."  Id. at 1024.

As discussed above, this court held in McKinley that where a jury has returned a general verdict on a multi-object conspiracy charge, the district court may treat the conviction as a determination that the defendant was convicted on a separate count of conspiracy for each offense the defendant conspired to commit only if the court finds beyond a reasonable doubt that the defendant conspired to commit that offense.  See id. at 1026.

In United States v. Pace, the defendants were charged with a conspiracy with two objects:  (1) possession with intent to distribute "methamphetamine/amphetamine" and (2) an attempt to manufacture methamphetamine.  See 981 F.2d at 1126.  The district court submitted a general verdict form to the jury without objection from defense counsel.  See id. at 1127.  The jury convicted the defendants of conspiracy and the Tenth Circuit affirmed the conspiracy conviction.  See id. at 1129.  The court also held, however, that the sentence on the conspiracy count could not stand because "the jury might have convicted defendants

based on conspiracy to possess with intent to distribute amphetamine . . . ." Id.

The Tenth Circuit did not discuss whether § 1B1.2(d) or Application Note 5 violated the Fifth or Sixth Amendments. More recently, in United States v. Bush, the Tenth Circuit quoted from the Ninth Circuit's dictum in United States v. Garcia regarding the Ninth Circuit's "doubt" about the constitutionality of § 1B1.2(d) and Application Note 5. See Bush, 70 F.3d at 561. The Tenth Circuit's comment was also dictum because the issue before it did not concern a general verdict in a multi-object conspiracy. Section 1B1.2(d) and Application Note 5 only apply to general verdicts tendered in multi-object conspiracy cases. Instead, the question presented to the Tenth Circuit was whether the appellant intended to plead guilty to conspiracy to distribute cocaine base, conspiracy to distribute cocaine powder, or both. See id. at 562. The indictment alleged that the defendant had conspired to distribute "cocaine (powder) and/or cocaine base (crack)." Id. at 559. The district court calculated the offense based on the assumption that the object of the conspiracy was to distribute cocaine base. See id. at 560. The Tenth Circuit affirmed the sentence despite the ambiguity in the indictment because it determined that the evidence in the record was sufficient to show that the defendant intended to plead guilty to conspiracy to distribute cocaine base. See id. at 562.

-55-

The question whether a sentencing decision made pursuant to § 1B1.2(d) and Application Note 5 violates the Fifth and Sixth Amendments was squarely addressed by the Third Circuit in United States v. Conley, 92 F.3d 157 (3rd Cir. 1996), cert denied, ___ U.S. ___, 117 S. Ct. 1244 (1997).  In Conley, the Third Circuit held that a sentence imposed following a general verdict of guilty on a multi-object conspiracy charge does not violate the Fifth and Sixth Amendments if the court, in formulating its sentencing decision, finds beyond a reasonable doubt that the defendant committed each object of the conspiracy.  See id. at 165-69.  The court reasoned as follows:

> We start our analysis of this Sixth Amendment argument with McMillan v. Pennsylvania, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986).  There the Supreme Court permitted a state to treat conduct which arguably was an element of a criminal offense, the visible possession of a weapon during certain  offenses, as a sentencing factor.  As a result, the trial court rather than the jury would determine whether the sentencing factor was present and would do so by the preponderance of the evidence.  The Court in reaching its result explained:
>
>> While `there are obviously constitutional limits beyond which the States may not go in this regard,' ibid., `[t]he applicability of the reasonable-doubt standard . . .  has always been dependent on how a State defines the offense that is charged in any given case.'
>
> Id. at 83-85, 106 S.Ct. at 2415 (quoting Patterson v. New York, 432 U.S. 197, 211 n. 12, 97 S.Ct. 2319, 2327 n. 12, 53 L.Ed.2d 281

(1977)).  The Court analyzed the Sixth Amendment claim tersely:

> Having concluded that Pennsylvania may properly treat visible possession as a sentencing consideration and not an element of any offense, we need only note that there is no Sixth Amendment right to jury sentencing, even where the sentence turns on specific findings of fact.

Id. at 92, 106 S.Ct. at 2419 (citing Spaziano v. Florida, 468 U.S. 447, 459, 104 S.Ct. 3154, 3161, 82 L.Ed.2d 340 (1984)).

It is clear from McMillan, that if section 1B1.2(d) is, in the words of McMillan, properly a "sentencing consideration," then the section does not infringe the Sixth Amendment right to jury trial.  The Chief Justice's concurring opinion in United States v. Gaudin, ___ U.S. ___, ___, 115 S.Ct. 2310, 2321, 132 L.Ed.2d 444 (1995), is in harmony with McMillan. There the Chief Justice noted that:

> Nothing in the Court's decision stands as a barrier to legislatures that wish to define--or that have defined--the elements of their criminal laws in such a way as to remove issues such as materiality from the jury's consideration.  We have noted that the definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes which are solely creatures of statute.

Id.  (Rehnquist, C.J., concurring) (internal quotation marks omitted).  We must decide, therefore, whether the determination of the object of a multi-object conspiracy following a general verdict of guilty properly can be deemed the ascertaining of a sentencing consideration or whether such a determination is beyond the "constitutional limits" referred to in McMillan, 477 U.S. at 85, 106

-57-

S.Ct. at 2415, and <u>Patterson v. New York</u>, 432 U.S. 197, 210, 97 S.Ct. 2319, 2327, 53 L.Ed.2d 281 (1977).

This issue is controlled by the Court's holding in <u>Griffin v. United States</u>, 502 U.S. 46, 112 S. Ct. 466, 116 L.Ed.2d 371, where the Court rejected the due process argument that a general verdict of guilty in a multi-object conspiracy verdict could not stand if the evidence to support a conviction for conspiracy to commit one of the objects was insufficient. The Court reached that result notwithstanding its almost contemporaneous holding in <u>Sullivan v. Louisiana</u> that the prosecution "must persuade the factfinder `beyond a reasonable doubt' of the facts necessary to establish each of [the] elements" of the crime. 508 U.S. 275, 278, 113 S.Ct. 2078, 2080, 124 L.Ed.2d 182 (1993). As the Court explained in Sullivan, "the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt." <u>Id.</u> at 278, 113 S.Ct. at 2081.

If, as Conley asserts, it were constitutionally impermissible to treat the object of a multi-object conspiracy indictment as a sentencing factor rather than as an element of the crime, then it is difficult to understand how the <u>Griffin</u> Court, consistently with <u>Sullivan</u>, could have permitted a conspiracy conviction to stand when there was insufficient evidence to support a conviction for one of the objects. After all, if each object of the conspiracy had been an element of the crime then under well-established law the defendant in <u>Griffin</u> would have been entitled to an acquittal since the proofs could not support the charge that she conspired with respect to one object. Thus, while Conley argues that violation of each object of the conspiracy must be considered a separate element of the offense for the purpose of his Sixth Amendment right to a jury trial, it is clear from <u>Griffin</u> that making the object of a conspiracy charged under 18 U.S.C. § 371 a

-58-

> matter for the sentencer rather than an
> element of the crime does not violate the
> Sixth Amendment."

Id. at 165-66.

In addressing the Fifth Amendment, the court stated:

> As we have indicated, Conley also argues
> that his sentence violates the Due Process
> Clause of the Fifth Amendment because the
> district court's power to make the crucial
> finding that an object of the conspiracy was
> money laundering.  Here we are guided by the
> Court's holding in McMillan.  There the Court
> considered a Pennsylvania statute which
> subjected defendants convicted of certain
> felonies to a mandatory minimum sentence of
> five years imprisonment if the sentencing
> judge found, by a preponderance of the
> evidence, that the person "visibly possessed
> a firearm" during the commission of the
> offense.  The Court found that the
> preponderance of the evidence standard was
> constitutional but explained that "in certain
> limited circumstances Winship's
> reasonable-doubt requirement applies to facts
> not formally identified as elements of the
> offense charged."  McMillan, 477 U.S. at 86,
> 106 S.Ct. at 2416 (citing In re Winship, 397
> U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368
> (1970)).

Id. at 168.

In United States v. Manges, 110 F.3d 1162 (5th Cir. 1997),

relying on Conley, the Fifth Circuit rejected a claim that

§ 1B1.2(d) and Application Note 5 are unconstitutional.  See id.

at 1179.  The Second Circuit has also held that § 1B1.2(d) and

Application Note 5 involve "valid sentencing considerations and

not the violation of any Sixth Amendment guarantee."  United

States v. Malpeso, 115 F.3d 155, 168 (2d Cir. 1997) (citing United States v. Conley, 92 F.3d 157, 168 (3rd Cir. 1996), cert. denied, ___ U.S. ___, 117 S. Ct. 1244 (1997)).

We also agree with the Third Circuit's analysis in Conley. Accordingly, we hold that § 1B1.2(d) and Application Note 5 do not violate the Fifth and Sixth Amendments.

We next turn to the question whether the district court's determination that money laundering was an object of the conspiracy was consistent with McKinley's interpretation of § 1B1.2(d) and Application Note 5. To comply with § 1B1.2(d) and Application Note 5, where the jury's verdict does not establish which offense was the object of the conspiracy, "the court must find beyond a reasonable doubt that the defendant conspired to commit the particular object offense." McKinley, 995 F.2d at 1026.

The district court did not make an express finding that Ross and Adams conspired to commit the offense of money laundering. The court explained its decision to apply the money laundry guideline as follows:

> And under the evidence as I heard it, accepting the jury's verdict of conspiracy, they would have a basis in the facts to determine that they had conspired to commit money laundering. And, therefore, that is an appropriate guideline if for no other reason my factual determination that there is sufficient evidence in the record that the jury made that finding as well as the others. I might add, just to cover the record. So I

-60-

> do find that it's appropriately scored under
> the money laundering guideline.

The district court did not state that it had determined that the evidence was sufficient to persuade it beyond a reasonable doubt that Ross and Adams conspired to commit the offense of money laundering. Because of the court's comment that the evidence was sufficient for the jury to determine that Ross and Adams conspired to commit money laundering, we cannot say with any degree of certainty that the court made an independent determination of this fact. McKinley compels us to vacate the sentencing decision and remand for appropriate factual findings. See id. at 1026.

Ross and Adams also contend that the district court selected the wrong subsection of U.S.S.G. § 2S1.1(a) as a standing point for the calculation of their sentence. The Government argues that this issue was waived because it was not raised properly. In view of our conclusion that we must vacate the sentence, we decline to resolve this dispute. Upon remand, both sides will have an opportunity to present their conflicting views to the district court in a timely manner.

Adams asserts that the district court erred in concluding that he is liable for a total of $1,702,599.64 laundered by all the conspirators without supporting this conclusion with appropriate findings. We decline to consider this question in view of the fact that we have concluded that this matter must be

remanded for appropriate findings regarding whether the money laundering guidelines are applicable.

## V. ASSIGNMENT TO A DIFFERENT JUDGE

Ross and Adams request that we order this matter assigned to a different judge upon remand. They argue that in denying their motion for bail on appeal, the district court stated that even if it had sentenced the defendants under a fraud guideline, "this range of loss would lead to a guidelines calculation resulting in a term of imprisonment longer than the likely duration of their appeal." Adams Br. at 53. Ross and Adams argue that reassignment is required because the district court's comment demonstrates that the district court has prejudged what it would do in the event this court vacated its sentence. We disagree. The district court judge's comments at the bail hearing do not support an inference that he will fail to consider the evidence presented at the sentencing hearing upon remand or that he will refuse to follow the law.

## CONCLUSION

We AFFIRM the judgment of conviction on each count. We VACATE the sentences and REMAND for resentencing.