[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 10-11579, 10-11603
_____

D. C. Docket Nos. 1:09-cr-20407-PCH-2
1:09-cr-20407-PCH-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

YVONNE SOUFFRANT,
GARRY SOUFFRANT,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(April 23, 2013)

Before TJOFLAT and MARTIN, Circuit Judges, and BUCKLEW,* District Judge.

PER CURIAM:

---

\* Honorable Susan C. Bucklew, United States District Judge for the Middle District of Florida, sitting by designation.

This appeal involves two criminal defendants, Garry Souffrant and Yvonne Souffrant (husband and wife), who were convicted in a multi-million dollar mortgage fraud conspiracy in South Florida in 2009.[1]

On appeal, Garry and Yvonne challenge their convictions and sentences. After careful review of the record and the parties' briefs, and after having the benefit of oral argument, we affirm the defendants' convictions and sentences.

## I. FACTS AND PROCEDURAL HISTORY

We recite the facts of this case in the light most favorable to the government. United States v. Augustin, 661 F.3d 1105, 1111 (11th Cir. 2011). First, we briefly describe the procedural history to help frame the facts.

### 1. Procedural History

In May 2009, a grand jury returned a fifty-nine count indictment against Garry and Yvonne.[2] The indictment charged three counts of conspiracy (counts 1–3) and fifty-six substantive offenses (counts 4–59). Garry was named in every count, while Yvonne was named in only two conspiracy counts and eight substantive counts. Garry and Yvonne were charged in count 1 with conspiracy to:

---

[1] We refer to the Mr. and Mrs. Souffrant by their first names for clarity.

[2] A third defendant, Gamaliel (Neil) Souffrant, Garry's older brother, was also charged in the same indictment and went to trial with Garry and Yvonne. Specifically, Neil was charged in counts 1 and 2 with conspiracy, as well as three substantive offenses (counts 24, 47, and 56), and acquitted of all charges.

2

(a) commit mail fraud (18 U.S.C. § 1341); (b) commit wire fraud (18 U.S.C. § 1343); (c) make a false statement to a mortgage lender (18 U.S.C. § 1014); (d) commit bank fraud (18 U.S. § 1344); (e) steal bank funds (18 U.S.C. § 2113(b)); and (f) receive stolen bank funds (18 U.S.C. § 2113(c)), all in violation of 18 U.S.C. § 371. Garry and Yvonne were charged in count 2 with conspiracy to launder illegal proceeds in violation 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h). Garry and Yvonne were also charged together in eight substantive counts: counts 9, 26, 29, 30, 31, 34, 46 and 55. Garry was charged in the remaining counts of the indictment without Yvonne: count 3, conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846; counts 4–8, 10–23, 27–28, 33, and 36–37, making false statements to a mortgage lender in violation of 18 U.S.C. § 1014; counts 24–25, 32, 35, 39–41, and 47, mail fraud in violation of 18 U.S.C. § 1341; counts 38, 42–45, bank fraud in violation of 18 U.S.C. § 1344; counts 48–53, stealing bank funds in violation of 18 U.S.C. § 2113(b); counts 54, and 56–59, receipt of stolen bank funds in violation of 18 U.S.C. § 2113(c).

On November 23, 2009, the jury returned guilty verdicts against Garry as to counts 1–2, 4–20, 22–23, 26–29, 32–33, 35–45, 49–52, and 56–59. Garry was found not guilty as to counts 3, 21, 24–25, 30–31, 34, 46–48, and 53–55. Yvonne was convicted on two counts—conspiracy to commit bank fraud (count 1) and

3

making a false statement to a mortgage lender (count 29)—and acquitted on the remaining counts.[3]

Garry and Yvonne were sentenced together on March 31, 2009. Garry was sentenced to 240 months in prison. Yvonne was sentenced to 54 months in prison.

On August 25, 2010, the district court amended Yvonne's judgment to order restitution to the Bank of America in the stipulated amount of $87,500. After a restitution hearing on September 3, 2010, Garry was ordered to pay $4,779,830.99 in restitution to victims Bank of America, Wells Fargo Bank, N.A., Tower Mortgage, HSBC Bank USA, N.A., and Provident Funding. The government waived its right to seek forfeiture.

## 2. Facts

### A. Background and Trial

From 2002 to 2008, Garry and Yvonne owned and operated Progressive Real Estate of Broward, Inc. (PREB).[4] During the approximately four-week trial, the government presented more than sixty witnesses in its case-in-chief, twelve rebuttal witnesses, and introduced hundreds of documents, such as Uniform Residential Loan Applications (URLAs, also called Form 1003s) and settlement

---

[3] Yvonne's jury verdict form inadvertently omitted count 9 and that count was later dismissed.

[4] PREB was also indicted as a corporate defendant but the charges were dismissed by the district court on the government's request prior to trial.

4

statements (also known as HUD-1s).  The government's witnesses included more than half a dozen cocaine traffickers who were clients of the defendants' real estate business, PREB; title and closing agents who worked on the defendants' real estate transactions; government investigators; and a variety of other witnesses, such as individuals who acted as straw or nominee purchasers for Garry—all of whom testified about their financial transactions and relationships with the Souffrants.

By the time of the Souffrants' trial, many of the government's witnesses had already been convicted, were either awaiting sentencing in related cases, or had already been sentenced, and were cooperating with the government's prosecution against the Souffrants.  For example, Tricia Ann Blair and Beverly Linton-Davis, both attorneys who had handled real estate closings for the Souffrants, pleaded guilty and testified against the defendants at trial.  Blair pleaded guilty to one count of conspiracy to commit bank fraud and mail fraud, and two counts of providing false income tax returns, and was disbarred.  Specifically, Blair told the jury that she had pleaded guilty "to providing false information to lending institutions in conspiracy with [Garry].  At [Garry's] direction and request [Blair] falsified several 1003's."  Blair identified Garry and Yvonne as her co-conspirators.

Blair explained that she began working as a solo practitioner in 2004, and eventually, Garry became her primary client.  She testified about several real estate

5

transactions in which Garry purchased real estate for himself or friends and directed Blair to title the properties in the names of a nominee or straw buyer. Further, Blair testified that Garry admitted to her that the property actually belonged to him or to his friends, who were drug dealers and did not want to hold property in their names. Garry also told Blair that he paid nominees to use their names and credit standing on mortgage applications. To this end, Garry directed Blair to prepare mortgage applications for the nominees' signatures, to falsely state that the nominees had sufficient income to qualify for the loans, and to falsely state that the nominees intended to make the property their primary residences. Rather than pay off existing mortgages at closing, Garry directed Blair to divert the proceeds of ten loans amounting to over $5 million dollars.

Defendant Garry testified for three and a half days in his own defense and denied all of the allegations against him. Defendant Neil also testified in his own defense and denied the allegations against him. Yvonne did not testify.

As noted, the jury returned mixed verdicts, acquitting Neil of all charges, convicting Garry of most charges, and acquitting Yvonne of all but two charges. After conviction, probation prepared presentence reports.

## B.  Sentencing

6

Before sentencing, the Souffrants filed written objections to their PSRs, and the government filed responses. At sentencing, the district court heard argument about the Souffrants' objections to the PSRs. With respect to the guidelines calculations, the district court overruled all of the defendants' objections except for one, the two-level breach of trust enhancement applicable to Garry. The district court calculated Garry's offense level to be 41, with a criminal history category I (324 to 405 months imprisonment). Garry was granted a downward variance and sentenced to 240 months in prison. Yvonne was also granted a downward variance and sentenced to 54 months in prison, after the district court determined her advisory guideline range was 108 to 135 months (offense level 31, criminal history category I).

## II.  STANDARDS OF REVIEW

The Souffrants raise a number of issues on appeal. We review de novo the following pretrial and trial questions: whether the initial joinder of charges under Federal Rule of Criminal Procedure 8(a) was proper, United States v. Hersh, 297 F.3d 1233, 1241 (11th Cir. 2002); interpretation of a rule of evidence, see United States v. Paul, 175 F.3d 906, 909 (11th Cir. 1999) ("plenary review"); challenges to jury instructions, United States v. Bender, 290 F.3d 1279, 1284 (11th Cir. 2002); whether an indictment has been constructively amended by jury instructions, see

7

United States v. Sanders, 668 F.3d 1298, 1309 n.9 (11th Cir. 2012); whether cumulative errors have deprived the defendant of a fair trial, see United States v. Calderon, 127 F.3d 1314, 1333 (11th Cir. 1997); sufficiency of evidence supporting a criminal conviction, United States v. Diaz, 248 F.3d 1065, 1084 (11th Cir. 2001); a district court's interpretation of a criminal statute, United States v. Krawczak, 331 F.3d 1302, 1305 (11th Cir. 2003); and, whether the district court misstated the law in its own instructions, United States v. Deleveaux, 205 F.3d 1292, 1296 (11th Cir. 2000).

We generally conduct abuse of discretion review of the following pretrial and trial issues: a district court's denial of a motion to sever under Federal Rule of Criminal Procedure 14, Hersh, 297 F.3d at 1241; a district court's refusal to grant a mistrial, United States v. Newsome, 475 F.3d 1221, 1227 (11th Cir. 2007); a district court's evidentiary rulings, see United States v. Gamory, 635 F.3d 480, 492 (11th Cir. 2011) (reviewing such errors for a "clear abuse of discretion" and subject to harmless error) (quotation marks omitted); admissibility of opinion testimony, United States v. Hands, 184 F.3d 1322, 1326 (11th Cir. 1999); and, admissibility of expert polygraph testimony, United States v. Piccinonna, 885 F.2d 1529, 1537 (11th Cir. 1989).

8

A district court's interpretation of a sentencing guideline is reviewed de novo; its findings of fact are reviewed for clear error; and its application of the sentencing guideline to the facts is reviewed de novo. United States v. Mandhai, 375 F.3d 1243, 1247 (11th Cir. 2004). The final sentence is reviewed for reasonableness, which is tantamount to an abuse-of-discretion standard of review. United States v. Pugh, 515 F.3d 1179, 1188–91 (11th Cir. 2008). We review de novo the legality of an order of restitution and related findings of fact for clear error. United States v. Hasson, 333 F.3d 1264, 1275 11th Cir. 2003).

Finally, Federal Rule of Criminal Procedure 52(b)'s plain error standard "provides a court of appeals a limited power to correct errors that were forfeited because not timely raised in district court." United States v. Olano, 507 U.S. 725, 731, 113 S. Ct. 1770, 1776 (1993). Under Rule 52(b), "before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights." United States v. Cotton, 535 U.S. 625, 631, 122 S. Ct. 1781, 1785 (2002) (quotation marks and alterations omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. at 631–32, 122 S. Ct. at 1785 (quotation marks and alterations omitted).

## III. DISCUSSION

On appeal, the defendants raise seventeen issues which they argue compel a new trial or reduced sentence. We conclude that several of these issues are without merit and therefore do not address them.[5] After careful review and oral argument, we conclude that these issues, and any other arguments not addressed in further detail in this opinion, either lack merit or are foreclosed by circuit precedent and warrant no further discussion.[6] We address the remaining nine claims in turn.

### 1. DENIAL OF SEVERANCE

This issue was raised by both Garry and Yvonne.

---

[5] The following issues lack merit. Garry and Yvonne both argue: (1) cumulative errors deprived them of a fair trial; (2) the district court clearly erred in applying a two-level increase for ten or more victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i); (3) the district court clearly erred in applying a two-level enhancement for gross receipts of $1 million or more, pursuant to § 2B1.1(b)(14)(A); and (4) the district court clearly erred in applying the sophisticated means enhancement, pursuant to § 2B1.1(b)(9)(C). Yvonne separately argues the district court erred in finding that she did not qualify for a minor role adjustment, pursuant to § 3B1.2. Garry individually argues: (1) the district court clearly erred in applying an obstruction of justice enhancement to him, pursuant to § 3C1.1; (2) the district court clearly erred in applying the enhancement for being in the "business" of money laundering, pursuant to § 2S1.1(b)(2)(C); and (3) the district court clearly erred in applying the four-level leadership role enhancement, pursuant to § 3B1.1(a).

[6] For example, many of the sentencing issues raised by the defendants relate to the district court's factual findings and determinations, which we review for clear error. District courts have "considerable discretion in making [these kinds of] fact-intensive determination[s]." United States v. Boyd, 291 F.3d 1274, 1277–78 (11th Cir. 2002). Here, neither defendant has shown the district court clearly erred in calculating their applicable guideline range. Nor has either defendant shown, to the extent the district court's application of the guidelines involved legal questions subject to de novo review, that the district court erred in its interpretation of the guidelines. See United States v. Rodriguez-Lopez, 363 F.3d 1134, 1136–37 (11th Cir. 2004) (stating, with respect to Sentencing Guidelines issues, this Court reviews "purely legal questions de novo, a district court's factual findings for clear error, and, in most cases, a district court's application of the guidelines to the facts with due deference") (quotation marks omitted).

Prior to and during trial Garry moved to sever count 2 (money laundering) and count 3 (drug conspiracy). Garry also moved for mistrial based on the government's presentation of evidence relating to drug trafficking activity by other persons known to him. Garry argues the district court erred in denying his motion to sever the money laundering and drug conspiracy counts, and in denying his motions for mistrial based on unfair prejudice from the denial of severance motions. His contention is that the core factual issues in dispute related to mortgage fraud and for that reason the inclusion of drug charges and money laundering charges allowed the government to introduce evidence about drug trafficking by people not a part of his case. He argues this prejudiced his ability to defend against the central mortgage fraud allegations.

For her part, Yvonne argues that the trial court erred in failing to sever her case from that of Garry. She says that her joint trial with Garry subjected her to irrelevant and inflammatory evidence—such as days of testimony about Garry's alleged drug trafficking and his alleged threatening of witnesses and efforts to suborn perjury—that deprived her of a fair trial. Yvonne emphasizes that Garry was charged in all 59 counts of the indictment, but she was only jointly charged in eight substantive counts, not including the two conspiracy counts.

11

The government counters that the court properly exercised its discretion to deny severance because the joinder of the offenses and the appellants was in keeping with Federal Rules of Criminal Procedure 8 and 14.

In determining whether separate charges were tried properly at the same time, this Court: (1) reviews de novo whether the initial joinder of charges under Rule 8(a) was proper; and (2) determines whether the district court abused its discretion under Rule 14 by denying a motion to sever. Hersh, 297 F.3d at 1241. Rule 8 is construed broadly in favor of initial joinder. Id. If improper joinder occurred, reversal is not required if the misjoinder was harmless error. United States v. Dominguez, 226 F.3d 1235, 1238 (11th Cir. 2000) (reviewing Rule 8(a) claim); United States v. Weaver, 905 F.2d 1466, 1477 (11th Cir. 1990) (reviewing Rule 8(b) claim). We will first analyze Garry's misjoinder of offenses claim, then Yvonne's misjoinder of defendants claim.

With respect to Garry's argument, Rule 8(a) permits joinder of multiple offenses in the same indictment or information. Joinder of offenses is permissible under rule 8(a) if the offenses "[1] are of the same or similar character, or [2] are based on the same act or transaction, or [3] are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Under this standard, the money laundering and drug counts were properly joined against Garry because the

12

government alleged and presented evidence at trial that the money laundering and drug conspiracy were a part of the overall mortgage fraud scheme. Indeed, the indictment alleged that Garry provided special real estate services to drug dealers to launder their money in real estate transactions that involved mortgage fraud.

As we noted, even if there had been improper joinder of offenses against Garry, the error would be subject to harmless error analysis. See United States v. Watson, 866 F.2d 381, 384–85 (11th Cir. 1989). An improper joinder is harmless unless it "results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." Weaver, 905 F.2d at 1477 (quotation marks omitted). "To establish that the district court abused its discretion in denying severance, a defendant must show that without severance he suffered compelling prejudice against which the trial court could offer no protection." United States v. Jacoby, 955 F.2d 1527, 1542 (11th Cir. 1992) (emphasis added) (quotation marks omitted). "The test for assessing compelling prejudice is whether it is within the capacity of jurors to follow a court's limiting instructions and appraise the independent evidence against each defendant solely on that defendant's own acts, statements and conduct, and, if possible, severance should not be granted." United States v. Silien, 825 F.2d 320, 323 (11th Cir. 1987).

13

Despite Garry's complaint of unfair prejudice and confusion, he has not

shown "compelling prejudice" sufficient to support a conclusion that the error, if

any, was harmful.  Here, the jury was given an appropriate cautionary instruction.[7]

The jury also acquitted Garry of the drug conspiracy (count 3) and several other

counts, demonstrating its ability to sift through the evidence and make an

individualized determination with respect to each count.  See, e.g., Jacoby, 955

F.2d at 1542–43 (severance denial upheld when jury convicted defendant of only 5

of 16 counts, showing jury had no problem following instructions or separating

evidence between counts).

Of course, under Rule 14, a judge may sever offenses properly joined if the

joinder becomes prejudicial before or during trial.  The key to determining whether

joinder of offenses is prejudicial is the likelihood that the jury will not consider

---

[7]  The district court instructed the jury to be cautious in evaluating the evidence as to each
defendant as follows:

> A separate crime or offense is charged against one or more of the
> Defendants in each count of the Indictment.  Each charge, and evidence pertaining
> to it, should be considered separately.  Also, the case of each Defendant should be
> considered separately and individually.  The fact that you may find any of the
> Defendants guilty or not guilty of any of the offenses charged should not affect
> your verdict as to any other offense charged.

> I caution you, members of the Jury, that you are here to determine from
> the evidence in this case whether each Defendant is guilty or not guilty of each
> offense as charged.  Each Defendant is on trial only for the specific offenses
> alleged in the Indictment.

14

evidence of each count separately.  See id. at 1542.  As set out above, Garry has not shown compelling prejudice because the jury acquitted him on many counts.

With respect to Yvonne's misjoinder claim, Rule 8(b) permits joinder of defendants in the same indictment or information when the defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b).  "There is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537, 113 S. Ct. 933, 937 (1993). Rule 8(b) permits joinder of defendants in the same indictment or information in order to achieve judicial economy and other important benefits.  Id.  Rule 14 gives the trial judge broad discretion to grant or deny severance of the joined counts or defendants after balancing the interest in judicial economy against the risk of prejudice to the defendant or the government.  See United States v. Saget, 991 F.2d 702, 707 (11th Cir. 1993) (denial of severance upheld because prejudice of joint trial did not outweigh interest in judicial economy where defendant was actually acquitted of a money laundering charge and codefendant acquitted of conspiracy charge).

Although Rule 8(b) does not require that each defendant be charged with each act in the series, there must be a logical relationship between each of the

15

defendants joined.  See, e.g., Saget, 991 F.2d at 707 (joinder of defendants proper when there is a "common thread" between charges).   Joinder is initially proper even if based only on allegations in the indictment that the defendants participated "in the same series of acts or transactions."  See United States v. LaSpesa, 956 F.2d 1027, 1032 (11th Cir. 1992) (initial joinder proper because indictment sufficiently alleged that all defendants involved in same series of acts or transactions constituting conspiracy offenses; court looks "only to the face of the indictment to determine whether joinder was proper").  By this Rule 8(b) standard, and under LaSpesa, Yvonne and Garry were properly joined as defendants because the indictment expressly alleged that they both were involved in the same series of transactions constituting the conspiracy.

Turning to Rule 14, whether Yvonne's trial should have been severed is a different question.  If a court finds sufficient prejudice, it may order severance under Rule 14 even though the initial joinder of defendants was proper under Rule 8(b).  Garry was clearly the leader and organizer of the conspiracy and charged with, and convicted of, many more substantive counts.  Yvonne was charged with ten counts and convicted on only two counts (counts 1 and 29), while Garry was charged in fifty-nine counts and convicted of the majority.  Thus, Yvonne's argument that she was unfairly prejudiced because the jury was exposed to

16

voluminous amounts of prejudicial evidence only relevant to Garry has some force. But we are not persuaded that she has shown the required prejudice.

In Zafiro v. United States, the Supreme Court held that "severance under Rule 14 [should be granted] only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." 506 U.S. at 539, 113 S. Ct. at 938. The possibility that evidence against codefendants may "spill over" on the defendant is insufficient to demonstrate compelling prejudice. See, e.g., United States v. Adams, 1 F.3d 1566, 1578 (11th Cir. 1993) (upholding denial of severance, despite disparity of evidence, because no compelling prejudice from joinder where evidence against defendant intertwined with criminal actions of codefendants, and jury instructed to separate evidence and that it could convict some defendants and acquit others). Again, Yvonne must show that the district court's refusal to grant severance was an abuse of discretion resulting in severe or compelling prejudice. See Jacoby, 955 F.2d at 1542. Yvonne fails to make the required showing. Here, the jury appeared to follow the court's cautionary instructions and demonstrated it was able to compartmentalize the charges and evidence against each defendant based on the fact it acquitted Yvonne of most charges. See id. at 1542–43.

17

## 2.  BLAIR'S TESTIMONY ADMITTING HER GUILT

This issue was raised by both Garry and Yvonne.

Yvonne argues that the district court erred in permitting one of the government's key witnesses, Tricia Ann Blair, to testify that in her opinion, Yvonne and Garry were her coconspirators and conspired with her to submit false information to Bank of America regarding a mortgage transaction.  Yvonne contends Blair's testimony on this issue allowed the government to use Blair's guilty plea as substantive evidence of the Souffrants' guilt.  Thus, she argues this undermined her right to a fair trial.

As we noted, Blair was an attorney who Garry used to do his real estate transaction work, and who had pleaded guilty in a separate case, in which she was charged with conspiring to commit mortgage and wire fraud, as well as tax evasion.  She was sentenced to six-months imprisonment and three years of supervised release.  Blair testified extensively at the Souffrants' trial about her involvement with the defendants and their mortgage fraud scheme.  During her direct testimony, the government questioned Blair about her guilty plea.  She testified that she had pleaded guilty to a conspiracy charge involving the submission of falsified URLA form 1003's to Bank of America for the purposes of obtaining loans.  Thus, Blair's testimony was relevant to count 1 (conspiracy to

18

commit offenses, including Bank Fraud) and count 29 (substantive offense of making a false statement to Bank of America to secure a mortgage on 7910 South Woodbridge Dr., Parkland, Florida).

Yvonne complains about the following exchange between the government and Blair during her direct examination, in which Blair was discussing her own guilty plea:

| [Government] | Tell the jury what you pled guilty to with regard to Count 1. |
| --- | --- |
| [Blair] | To providing false information to lending institutions in conspiracy with Mr. Souffrant. At his direction and request I falsified several 1003's. These are documents that we present to the bank initially to obtain approval for a loan. The information which was presented in - - |
| [Defense]: | I would object as non responsive. The question is what she was charged with. |
| The Court: | I think it was a general response. Why don't you break it down? |
| [Government]: | Did you conspire with other persons to commit that crime of submitting false information to Federal Deposit Insurance Corporation banks? |
| [Blair]: | Yes. |
| [Government]: | Who were your co-conspirators? |
| [Blair]: | Garry Souffrant. |

19

[Government]:       Anyone else?

[Blair]:       Yvonne Souffrant.

[Defense]:       I would object.  Calls for a legal conclusion as to who her co-conspirators are.

The Court:       Overruled.

Yvonne argues that Blair's testimony was "nothing less than an unequivocal opinion of an attorney, whom the jury may well have viewed as a legal expert, that Yvonne Souffrant and Garry Souffrant were guilty of conspiracy."  Yvonne maintains that such testimony is not admissible as lay testimony under Fed. R. Evid. 701 or expert testimony under Rule 702.  Additionally, Yvonne argues that Blair's opinion testimony that she and Garry were co-conspirators was also error because it allowed the government to use her plea agreement "as substantive evidence of the Souffrant's guilt."

The government responds that the district court did not err by permitting Blair's testimony about her guilty plea because Blair was simply a fact witness relating the details of the charges to which she pled and that her testimony was admissible under Rule 704.

A district court's evidentiary rulings are reviewed for a clear abuse of discretion and subject to harmless error analysis.  Gamory, 635 F.3d at 492. Admissibility of opinion testimony is reviewed under the abuse of discretion

20

standard.  Mann v. Taser Intern., Inc., 588 F.3d 1291, 1310 (11th Cir. 2009).

While Yvonne argues that the jury would have perceived and understood Blair's

testimony as being expert testimony of an attorney, the record does not fairly

support this conclusion.  First, Blair was presented to the jury as a disbarred

attorney.  Second, it does not appear from the record that she was qualified as an

expert in the field of law, that she was tendered as an expert, or that she was

accepted by the court as an expert.  Third, Blair testified at length as to the details

of her own criminal conduct in relation to the specific criminal conduct of Garry

and Yvonne as it related to the conspiracy and substantive counts of the

indictment.  In short, Blair was a fact witness who happened to be an attorney.

While it is true the government may not use the fact that Blair pled guilty to prove

the Souffrants' guilt, that is not what happened here.  Blair could and did testify as

to all the facts that made her guilty of conspiring with the Souffrants.  See

Countryman, 758 F.2d at 578.  And as the government correctly argues, it is

allowed to take the sting out of potential impeachment evidence, such as a guilty

plea, by discussing such evidence on direct examination.  Id. at 577.  In any event,

even if the jury believed Blair was an expert, "[a]n opinion is not objectionable just

because it embraces an ultimate issue."  Fed. R. Evid. 704.

21

Moreover, given the totality of Blair's extensive and detailed testimony, and its unquestioned relevance, we cannot conclude the district court abused its discretion in permitting Blair to identify Garry and Yvonne as her coconspirators. For this same reason, even assuming it was error to admit Blair's testimony that Yvonne and Garry were her coconspirators, we conclude any error was harmless. Blair's conspirator statement must be taken in the context of her lengthy testimony which included detailed testimony about specific instances of misconduct concerning Yvonne and Garry as it related to the conspiracy and substantive counts.

### 3. ALEXANDER'S POLYGRAPH

This issue was raised by both Garry and Yvonne.

Yvonne argues the trial court erred in allowing the government to impeach its own witness, Lathosha Alexander, with polygraph evidence during her redirect testimony.

Lathosha Alexander testified as a government witness at trial regarding a number of substantive counts in the indictment. The government had separately charged Alexander with money laundering and making false statements to a mortgage lender. Alexander pleaded guilty to making false statements to a mortgage lender and agreed to cooperate with the government. It was the

22

government's contention at trial that Alexander acted as a straw or nominee purchaser of property for Garry. On cross examination, Alexander testified that neither Garry nor any of the other individuals on trial had anything to do with the charges she previously pled guilty to. Alexander explained on cross examination that she had a cooperation agreement with the government, that she had truthfully told the government everything she knew, and that she did not get a sentence reduction in her own case. Further, she testified on cross examination that she did not "receive a sentence reduction although [she] provided truthful information because [she] would not falsely implicate Garry Souffrant."

After Alexander's cross examination was finished, the following exchange occurred sidebar:

[Government]: We would like to come [to] sidebar. I would like to redirect as to the reason. She knew why. This reason is because she flunked the polygraph.

[Court]: You opened it up. He is certainly entitled to go into that area. You asked her what the Government thought.

[Defense]: I asked for her thought.

[Court]: I am going to allow it.

[Defense]: Note our objection under U.S. versus Picanona [sic].

[Court]: I will allow redirect. I think we should probably have some kind of instruction that typically

23

> polygraph evidence is not admissible, but it's only being offered for the limited purpose of showing why the Government did not file a sentence reduction. Do you want that instruction?

[Defense]    I would object to that. For the record, there's no instruction that could cure the Government being allowed to put before this jury the proposition that this witness took a polygraph examination.

After this exchange, the government went into some detail on redirect about the reasons why it did not give Alexander a sentence reduction, including (1) that government agents did not believe she was being "accurate" during her debriefing; (2) that she was asked to take a polygraph; (3) that she was polygraphed by the FBI; (4) that her lawyer was present; (4) that she was asked questions about Garry; (5) that she was asked questions about "laundering money through the sale and purchase of real estate property;" and (6) that she "took the test and flunked." Defense counsel moved for a mistrial which the district court denied.

Yvonne maintains the admission of this evidence was error for three reasons: (1) it was contrary to binding circuit precedent, see United States v. Piccinonna, 885 F.2d 1529 (11th Cir. 1989) (en banc); (2) it failed to meet the gateway test for expert testimony under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 113 S. Ct. 2786, 2799 (1993); and (3) it "placed the government in the position of impermissibly vouching for the credibility of other cooperating

24

witnesses in the case." Garry adds that it also violated his right to confrontation by interjecting the expert opinion of the polygraph examiner into the case. We review the objection based on Piccinonna for abuse of discretion because it was preserved below. We review the other claims for plain error.

Yvonne correctly argues that Piccinonna held that polygraph evidence is admissible in only two limited situations: (1) where the parties stipulate (which does not apply here); or, as relevant here, (2) to impeach or corroborate the testimony of a witness at trial. See Piccinonna, 885 F.2d at 1536. In addition, there are procedural requirements which must be met:

> First, the party planning to use the evidence at trial must provide adequate notice to the opposing party that the expert testimony will be offered. Second, polygraph expert testimony by a party will be admissible only if the opposing party was given reasonable opportunity to have its own polygraph expert administer a test covering substantially the same questions. Failure to provide adequate notice or reasonable opportunity for the opposing side to administer its own test is proper grounds for exclusion of the evidence.

Id. Third, "whether used to corroborate or impeach, the admissibility of the polygraph [evidence] will be governed by the Federal Rules of Evidence for the admissibility of corroboration or impeachment testimony," such as Rule 608. Id. If admissible under these rules, it may still be excluded on other grounds, such as Rule 702, 401, and 403. Id. Here, although the government relied on the

25

polygraph evidence for impeachment, there is no indication that Piccinonna's first two preconditions were satisfied.

Although the district court "has wide discretion in this area, and rulings on admissibility will not be reversed unless a clear abuse of discretion is shown," Piccinonna, 885 F.2d at 1537, we conclude the district court committed error in this instance. The defendant was clearly not afforded the rights required by Piccinonna to (1) notice that the evidence was going to be offered or (2) an opportunity to conduct its own polygraph examination. We reject the government's argument to create an exception to Piccinonna's requirements under the circumstances of this case. Piccinonna does not provide for such an exception. We find the government's interjection of the polygraph issue into this case to be improper.

Even though we determine the district court erred by admitting evidence about Alexander's polygraph examination under Piccinonna, we conclude the error was harmless. Kotteakos v. United States provides that non-constitutional error is harmless "if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." 328 U.S. 750, 764–65, 66 S. Ct. 1239, 1248 (1946). We use this same standard "to review the prejudicial effects of a district

26

court's plain error, be it of constitutional or non-constitutional dimensions."
United States v. Baker, 432 F.3d 1189, 1224 (11th Cir. 2005).  Viewing the error in
the context of a  lengthy trial involving ample and independent evidence of the
defendants' guilt, separate and apart from Alexander's testimony, we can fairly say
"that the judgment was not substantially swayed by the error."

For this same reason, we conclude the defendants cannot show their
substantial rights were affected sufficient to demonstrate plain error based on their
arguments not preserved in the district court.  Finally, we cannot say the district
court abused its discretion when it denied the defendants' motion for a mistrial
following the government's redirect examination of Alexander.  See United States
v. Newsome, 475 F.3d 1221, 1227 (11th Cir. 2007) ("A mistrial should be granted
if the defendant's substantial rights are prejudicially affected . . . . [W]hen the
record contains sufficient independent evidence of guilt, any error was harmless.")
(quotation marks and citations omitted).

### 4.  THE VERDICT FORM AND JURY INSTRUCTIONS AS TO THE MULTIPLE OBJECTS CONSPIRACY IN COUNT ONE

This issue relates to Yvonne and to Garry to the extent he has adopted
Yvonne's argument.

Yvonne argues that her verdict form and jury instructions constructively
amended the indictment as to her conspiracy to commit bank fraud conviction—

count one of the indictment—because (1) the verdict form omitted the element that the defendant "knowingly devise[d] and intend[ed] to devise a scheme and artifice to defraud, and that the false, fraudulent representations and promises made to the financial institutions had to be material"; and (2) the jury instructions likewise omitted the "intent to devise" language and the element of "materiality." We do not reach the merits of Yvonne's arguments because we conclude that she invited any error in the jury instructions and verdict forms.

"It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." United States v. Ross, 131 F.3d 970, 988 (11th Cir. 1997) (quotation marks omitted). "The doctrine of invited error is implicated when a party induces or invites the district court into making an error." United States v. Stone, 139 F.3d 822, 838 (11th Cir. 1998). "Where invited error exists, it precludes a court from invoking the plain error rule and reversing." Ford ex rel. Estate of Ford v. Garcia, 289 F.3d 1283, 1294 (11th Cir. 2002) (quotation marks omitted).

Yvonne induced or invited the district court to rely on the verdict form and jury instructions that she now claims constructively amended the indictment. During the jury charge conference, the district court announced "[w]e need to talk about the jury instructions, [and] make sure we are all on board with that." After

28

the government represented on the record that it had "given defense counsel a current version of the written instructions," the district court then asked the parties: "Everyone is in agreement as to the oral and written version?" Yvonne's trial counsel answered: "Yes, your honor. I would ask both the oral and written versions be filed." Subsequently, before and after the jury was charged, neither Yvonne nor any other defendant objected to the instructions given.

Yvonne waived her right to challenge the jury instructions and verdict form when her trial counsel expressed his agreement with them. See United States v. Silvestri, 409 F.3d 1311, 1337 (11th Cir. 2005) ("[The defendant] affirmatively waived his right to challenge the instruction when his counsel told the district court that the jury instructions 'covered the bases.'"). "When a party responds to a court's proposed jury instructions with the words 'the instruction is acceptable to us,' such action constitutes invited error." Id.; see also United States v. Jernigan, 341 F.3d 1273, 1290 (11th Cir. 2003) (concluding that a criminal defendant invited error involving the introduction of a recorded statement into evidence when counsel responded to the district court's question "Is everybody agreeable to that?" by responding, "Yes, your honor"). Thus, Yvonne is now precluded from claiming the district court erred in its jury instructions and verdict form.[8]

---

[8] We conclude that Garry also invited error as to the jury instructions and verdict form, but for a different reason. Garry's counsel filed joint proposed jury instructions and verdict forms in the

## 5.  SUFFICIENCY OF THE EVIDENCE AS TO YVONNE

Yvonne claims the evidence at trial was insufficient to support the jury's guilty verdicts on count one (general conspiracy) and count twenty-nine (false statement to mortgage lender Bank of America).  Yvonne argues that the government presented insufficient evidence of her knowledge of the conspiracy and she merely "unknowingly helped the goals of the conspiracy by signing mortgage documents at her husband's request."

The law governing Yvonne's sufficiency of the evidence claim is well established:

> In reviewing a sufficiency of the evidence challenge, we consider the evidence in the light most favorable to the Government, drawing all reasonable inferences and credibility choices in the Government's favor.  A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt.  The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial.  But [w]hen the government relies on circumstantial evidence, reasonable inferences, not mere speculation, must support the conviction.

district court in which he affirmatively requested jury instructions and verdict forms.  Garry's proposed instructions and verdict forms, to the extent that they contain the defects complained of by Yvonne for count one, are materially indistinguishable from the instructions and verdict forms given.  Thus, Garry is also precluded from claiming the jury instructions constructively amended the indictment because he invited any error.  Because we conclude both Yvonne and Garry invited any error, we do not express any opinion as to the merits of their argument.

30

United States v. Friske, 640 F.3d 1288, 1290–91 (11th Cir. 2011) (alteration in original) (quotation marks omitted).

Count one of the indictment charged Yvonne with conspiracy to violate six different federal statutes, including bank fraud under 18 U.S.C. § 1344, and the jury convicted her of conspiracy to commit bank fraud.[9]  The elements for proving a conspiracy under 18 U.S.C. § 371 are: "(1) an agreement among two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement."  United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003).  "To prove bank fraud under 18 U.S.C. § 1344, the government must show that the defendant (1) engaged in a scheme or artifice to defraud, or made materially false statements or representations to obtain moneys, funds or credit from; (2) a federally insured financial institution; and (3) that the defendant acted knowingly."  United States v. De La Mata, 266 F.3d 1275, 1298 (11th Cir. 2001).

Count twenty-nine charged Yvonne with making a false statement to Bank of America, a federally insured financial institution, in violation of 18 U.S.C. §§

---

[9]  "A guilty verdict in a multi-object conspiracy will be upheld if the evidence is sufficient to support a conviction of any of the alleged objects."  United States v. Ross, 131 F.3d 970, 984 (11th Cir. 1997).

1014 and 2.  A defendant may be found guilty of making a false statement under §

1014 if the government proves the following facts beyond a reasonable doubt:

> First:      That the Defendant knowingly made a false statement or report to the financial institution described in the indictment;
>
> Second:   That the deposits of the institution were insured by the Federal Deposit Insurance Corporation; and
>
> Third:     That the Defendant made the false statement or report willfully and with intent to influence the action of the institution upon an application, advance, commitment or loan, or any change or extension thereof.

11th Cir. Pattern Jury Instruction (Criminal Cases), Offense Instruction 39

(2003).[10]

We conclude from the record that the evidence was sufficient for a

reasonable jury to conclude that (1) Yvonne was a knowing participant in the

conspiracy to commit bank fraud and (2) Yvonne knowingly made a false

---

[10]   The 2003 pattern jury instruction is consistent with 18 U.S.C. § 1014, which provides in relevant part:

> Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of . . . any institution the accounts of which are insured by the Federal Deposit Insurance Corporation,  . . . upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same . . .  shall be fined . . . or imprisoned not more than 30 years, or both.

18 U.S.C. § 1014 (2006).

32

statement for the purpose of influencing the action of Bank of America, a federally insured financial institution.

While the government's case against Yvonne was circumstantial, we cannot say that the jury's verdict was based on mere speculation or unreasonable inferences. A conspiracy conviction may be based upon circumstantial evidence. United States v. Adkinson, 158 F.3d 1147, 1153 (11th Cir. 1998). "Indeed, [b]ecause the crime of conspiracy is predominantly mental in composition, it is frequently necessary to resort to circumstantial evidence to prove its elements." United States v. Pinero, 389 F.3d 1359, 1369 (11th Cir. 2004) (alterations in original) (quotation marks omitted). And while not controlling, "presence and association are material and probative factors that a jury may consider in reaching its verdict." United States v. Lluesma, 45 F.3d 408, 410 (11th Cir.1995).

The government presented ample circumstantial evidence that Yvonne knew that her husband Garry defrauded banks and willingly participated in the fraud. The record shows Yvonne repeatedly signed loan applications containing false assertions. For example, in January 2004 Yvonne obtained a loan to buy 2264 S.W. 117th Avenue, Miramar, Florida, falsely stating that she had been an officer of PREB for the previous four years, earned $8,000 per month, and intended to make the house her permanent residence. PREB had not been incorporated until

33

2002.  Similarly, Yvonne signed another application for a loan on June 7, 2005, to buy 1828 N.W. 140th Terrace, Pembroke Pines, Florida, falsely stating that she had been the president of PREB for the previous four years earning $9,500 per month.

With respect to the property charged in count twenty-nine, Yvonne obtained a loan to buy 7910 South Woodbridge Drive, Florida by falsely stating that she had been employed by PREB as director of operations for three years and had an income of $21,635 per month.  And the government introduced a check in the amount of $100,000 signed by her to pay off the loan on this property months after it should have been paid off at closing.

Further, Blair, the attorney, testified that she had several conversations with Yvonne about Garry's diversion of bank funds during which Yvonne acknowledged that she knew of the fraud.

We do not view this as a close case on sufficiency of the evidence.  Drawing all reasonable inferences in the government's favor, there was ample evidence for the jury to infer that Yvonne had knowledge of the conspiracy and that her statements on her URLAs were false and material.  Given Blair's testimony as to her conversations with Yvonne, the conclusion that Yvonne had knowledge of the conspiracy is not mere speculation.  Also, given that Yvonne repeatedly signed

34

URLA's containing false statements, the jury was free to conclude that she did so knowingly despite her claim that she did not know about real estate transactions. See Pineiro, 389 F.3d at 1367 ("The evidence is sufficient so long as a reasonable trier of fact, choosing among reasonable interpretations of the evidence, could find guilt beyond a reasonable doubt.")

6. GARRY'S COUNT TWO MONEY LAUNDERING CONVICTION[11]

Garry contends the district court gave the jury money laundering instructions and jury verdict forms for count 2 that failed to limit the jury to valid theories of liability under 18 U.S.C. § 1956. He also argues there was insufficient evidence to support his count 2 conviction because the jury instructions and verdict form were flawed. We address his claim of error regarding the instructions first and his sufficiency argument second.

To begin, we need not reach the merits of Garry's arguments about the jury instructions and verdict forms because we conclude that he invited any error. As we noted, "a party may not challenge as error a ruling or other trial proceeding invited by that party." Ross, 131 F.3d at 988 (quotation marks omitted). "Where invited error exists, it precludes a court from invoking the plain error rule and reversing." Ford ex rel. Estate of Ford v. Garcia, 289 F.3d 1283, 1294 (11th Cir. 2002) (internal citation and quotation marks omitted).

---

[11] This issue only relates to Garry because Yvonne was not convicted on count two.

Garry's counsel filed joint proposed jury instructions and verdict forms with the district court which he affirmatively requested be given at trial.  See Doc.137. Garry's proposed instructions included jury instructions and verdict forms as to count two of the indictment—the money laundering conspiracy, 18 U.S.C. § 1956(h).  See Doc. 137 at 16–18 (proposed instruction No. 9), 50 (proposed verdict as to count two).  The proposed money laundering conspiracy jury instruction was based on, and identical in all material respects to, the Eleventh Circuit Pattern Jury Instructions (Criminal), Offense Instruction No. 70.5 (money laundering conspiracy, 18 U.S.C. § 1956(h)) (2003).  Further, the jury instructions and verdict forms given at trial regarding the money laundering conspiracy in count two of the indictment were materially indistinguishable from the proposed jury instructions and verdict forms on that same count.  We conclude Garry induced or invited the district court to rely on the verdict form and jury instructions that he now claims failed to limit the jury to valid theories of liability under 18 U.S.C. § 1956.  See Stone, 139 F.3d at 838 (11th Cir.1998) ("The doctrine of invited error is implicated when a party induces or invites the district court into making an error.").  Because Garry invited any error, he is precluded from

claiming the district court committed error by giving his proposed jury instructions and verdict form at trial.[12]

Second, about Garry's claim that there was insufficient evidence to support his money laundering conspiracy, our independent review of the record leads us to conclude there was sufficient evidence to support his conviction. Count two of the indictment alleged that the financial transactions in the money laundering conspiracy involved the proceeds of specified unlawful activities, and then identified four different activities: (1) drug trafficking; (2) scheme to commit mortgage fraud by mail; (3) mortgage fraud; (4) and bank fraud. The jury instructions on count two explicitly referenced the unlawful activities charged in the indictment with respect to the money laundering conspiracy 18 U.S.C. § 1956(h).

---

[12] Even if we had concluded that Garry did not invite error, we would review the merits of his claim for plain error because he failed to object to the jury instructions and verdict forms either during the charge conference or when given an opportunity to do so just prior to the jury being charged. Garry has not shown plain error. Garry argues count two of the indictment was fundamentally flawed because it did not specify or call upon the jury to make a unanimous determination of the "specified unlawful activity" for application of the money laundering conspiracy statute, 18 U.S.C. § 1956(h). He maintains the absence of specification of the source of the proceeds in the jury instructions or verdict form rendered the money laundering charge inherently defective because the jury was not required to unanimously agree on which "specified" activities covered by the money laundering statute were involved, if any. The problem for Garry under the plain error standard is his failure to identify any binding precedent from this Court or the Supreme Court that holds that a jury must unanimously agree on the underlying specified unlawful activity. The lack of such authority precludes a finding that the error was plain. An error is plain or obvious only if it is "clear under current law." United States v. Humphrey, 164 F.3d 585, 588 (11th Cir. 1999) (quotation marks omitted). An error is not clear under current law if no binding decisions from this Court or the Supreme Court in materially similar cases resolve the issue. Id.

37

First:     That two or more persons, in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan to violate 18 U.S.C. section 1956, as charged in the Indictment; and

Two:     That the Defendant, knowing the unlawful purpose of the plan, willfully joined it[.]

This statement of the elements of money laundering conspiracy is consistent with circuit precedent. See, e.g., United States v. Martinelli, 454 F.3d 1300, 1310 (11th Cir. 2006) (alterations in original) ("[T]he government bears the burden of proving beyond a reasonable doubt that: (1) two or more persons agreed to commit a crime, in this case a . . . money laundering violation; and (2) that [the defendant], knowing the unlawful plan, voluntarily joined the conspiracy.") (quotation marks omitted). There was ample evidence presented by the government supporting the money laundering conspiracy, as we set out above. This includes the testimony of various drug dealers and Blair that Garry knowingly conducted various financial transactions for the purpose of concealing the source of funds which he knew were derived from drug dealing, or mortgage fraud, bank fraud, or mail fraud. Reviewing the evidence in the light most favorable to the government, we conclude a reasonable jury could conclude that the evidence established Garry's conspiracy money laundering conviction beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also, United States

38

v. Herrera, 931 F.2d 761, 762 (11th Cir. 1991) ("A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt.").

Finally in this regard, while the jury verdict may not have reflected a unanimous agreement as to any one "specified unlawful activity" in support of the money laundering conviction, the jury was not required to find that, as a matter of money laundering liability, Garry was guilty of all of the elements of any particular offense. See Martinelli, 454 F.3d at 1310–12. Even assuming there was such a unanimity requirement, we know the jury did unanimously find that Garry was guilty of multiple substantive offenses, any one of which could have provided the predicate qualifying offense of "specified unlawful activity" to support the conspiracy money laundering within the statutory definition of "specified unlawful activity" in 18 U.S.C. § 1956(c)(7).

## 7. CALCULATION OF FRAUD LOSS

This issue was raised by both Garry and Yvonne.

Section 2B1.1(b)(1) of the Sentencing Guidelines provides for a sentencing enhancement based on the amount of loss caused by the defendant's offense. This section provides that a defendant's offense level should be increased by 18 if the offense involved a loss amount of more than $2.5 million but not more than $7

39

million.  U.S.S.G. § 2B1.1(b)(1)(J) (2010).  Both Garry's and Yvonne's sentencing guidelines were increased by 18 levels based on the district court's determination that the amount of loss caused by their offense was $4,513,276.

Garry argues that the district court erred by calculating the total loss amount based on a separate analysis of each transaction, in violation of the aggregate loss theory underlying U.S.S.G. § 3D1.2(d).[13]  He also notes that most of the financial institutions recovered their funds from title insurance, and that the district court applied a different method of loss calculation to coconspirators who were similarly situated and sentenced separately.  Garry emphasizes that the loss amount in his case was exaggerated by unprecedented volatility in the housing market and, as a result, he argues the unanticipated inflation of the loss amount was not a reasonably foreseeable pecuniary harm.  Finally, Garry challenges the reliability of the loss amounts based on property market values provided by a non-expert government agent.

In response, the government counters that the loss amount was properly based on the difference between fair market value of the properties referenced in the counts of conviction and the amounts of the related fraudulent loans, pursuant to U.S.S.G. § 2B1.1, cmt. (n.3(E)(ii)).  Beyond that, the government emphasizes

---

[13]  Garry's brief actually refers to U.S.S.G. § 3C1.2, which refers to "Reckless Endangerment During Flight," but we assume he intended to cite U.S.S.G. § 3D1.2(d)  which refers to offenses involving "aggregate harm."

that the amount of loss fell within the broad range provided in the guidelines, i.e., between 2.5 and 7 million dollars. See U.S.S.G. § 2B1.1(b)(1)(J).

At sentencing, the government submitted a loss calculation based on updated fair market values and mortgage information for the subject properties resulting in a loss amount of $6,461,290. At the district court's request, the government identified and deducted loss amounts related to conduct for which the defendants were acquitted or not indicted. These adjustments reduced the total loss amount to $4,513,276. The district court briefly questioned IRS Agent Keyes, who was responsible for the government's proposed loss calculations. Agent Keyes confirmed that he calculated the loss as follows: if the property had not been sold, he subtracted the outstanding mortgage balance from the property's fair market value; and if the property had been sold, he deducted the mortgage balance from the sales price. The fair market value was based on one of three sources: (1) actual sales price of the property, if sold; (2) the estimate found on the website zillow.com; or (3) if no zillow estimate existed, the market value from the county appraiser's office. The defendants objected to the calculation of loss.

The district court's amount-of-loss determination under the Guidelines is reviewed for clear error. United States v. Grant, 431 F.3d 760, 762 (11th Cir. 2005). A challenge to the district court's loss calculation premised on an

41

interpretation of the sentencing guidelines is reviewed de novo, as is a determination of whether the district court applied the correct formula in calculating loss for sentencing purposes. United States v. Clarke, 562 F.3d 1158, 1164 (11th Cir. 2009) (citing United States v. Hunerlach, 197 F.3d 1059, 1069 (11th Cir. 1999)). When a defendant challenges one of the factual bases of his sentence, the government has the burden of establishing the disputed fact by a preponderance of the evidence. United States v. Bernardine, 73 F.3d 1078, 1080 (11th Cir. 1996). The government meets this burden "by presenting reliable and specific evidence." Id.

Section 2B1.1(b)(1) of the Sentencing Guidelines provides for a sentencing enhancement based on the amount of loss caused by the defendant's offense. This section indicates that a defendant's offense level should be increased by 18 if the offense involved a loss amount of more than $2.5 million but not more than $7 million. U.S.S.G. § 2B1.1(b)(1)(J). When calculating loss for sentencing purposes, the district court looks to the greater of actual loss or intended loss. United States v. Willis, 560 F.3d 1246, 1250 (11th Cir. 2009). Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense," and intended loss is "the pecuniary harm that was intended to result from the offense." U.S.S.G. § 2B1.1, cmt. (n.3(A)(i) and (ii)). Because a defendant's intent is often

42

difficult to prove, it may be inferred from circumstantial evidence. Willis, 560 F.3d at 1250.

Garry argues that the sentencing court's calculation of the loss amount by looking at each transaction resulted in double-counted losses from properties that were listed in more than one count in the indictment and treated the diversion of funds from the attorney trust accounts as an additional loss. However, Garry failed to identify any particular property for which a loss was actually double-counted, either at sentencing or on appeal. Instead, he asserts that the loans on several properties were paid or that the market value exceeds the loan balance. The record shows that the sentencing court determined the loss amount by considering the difference between the mortgage amount and the asserted market value of each property associated with the counts of conviction. The district court did not consider the diverted loan proceeds as a supplemental loss amount. This suggests there was no double counting. Also, the district court excluded all losses on properties not associated with indicted and convicted conduct, although it could have included such losses. See Hamaker, 455 F.3d at 1338. Thus, Garry has failed to show, and the record does not otherwise support his contention, that the district court's method of loss calculation violated the guidelines by double-counting loss amounts.

43

Next, Garry argues that the district court should have taken into account that victim financial institutions have already recovered funds from the title insurance companies. However, the Sentencing Guidelines require the district court to look at intended loss, to the extent that it exceeds actual loss. U.S.S.G. § 2B1.1, cmt. (n.3(A)(i)–(ii); see Willis, 560 F.3d at 1250. The court's estimated loss amount properly considered the intended loss to the victim lenders, and Garry cannot avoid accountability for that loss merely because it was offset by title insurance. See United States v. Gupta, 463 F.3d 1182, 1200 (11th Cir. 2006) (rejecting "no harm, no foul" argument to avoid accountability for proceeds from fraudulent Medicare charges).

Finally, Garry challenges both the loan amounts and property values on which the government relied for its proposed loss calculation. Garry sufficiently preserved this issue in his written objections to his PSR and the district court considered the objection when it was raised by Yvonne. See United States v. Irey, 612 F.3d 1160, 1223 n.44 (11th Cir. 2010) (en banc).

We conclude the loss amount attributed to both Garry and Yvonne is supported by sufficiently reliable and specific evidence of the loss associated with each property. The district court relied on a government exhibit that apparently summarized the loss amount for each property. As mentioned above, the fair

44

market values in this exhibit were based on one of three sources: (1) actual sales price of the property, if sold; (2) the estimate found on the website zillow.com; or (3) if no zillow estimate existed, the market value from the county appraiser's office. While some of the fair market values in the exhibit were admittedly based on estimates taken from either county property records or the zillow.com website, the district court readily acknowledged that the figures it relied on were "a rough calculation." However, the district court indicated it took "some comfort" that the broad guideline loss range "would allow for some maybe overstating of the loss" without affecting the base offense level. Notably, although the government had the burden of proof, when the defendants objected to the district court's loss calculation at the sentencing hearing, they did not provide any property appraisals of their own to challenge the government's fair market values. On this unique record, the district court did not err.

The sentencing judge is in a singular position to assess the evidence and estimate the loss based upon that evidence, and, thus, "the sentencing judge's determination of loss is 'entitled to appropriate deference.'" Willis, 560 F.3d at 1251 (quoting U.S.S.G. § 2B1.1, cmt. (n.3(C))). "Although a district court must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines, its reasonable estimate of the intended loss will be

45

upheld on appeal." United States v. Grant, 431 F.3d 760, 762 (11th Cir. 2005) (quotation marks omitted). Here, the district court made a reasonable estimate of loss based on more than mere speculation. Although it is true the government could have submitted more reliable evidence, such as certified property appraisals for each property, the evidence submitted by the government was sufficiently specific and reliable to meet its burden of establishing the amount of loss by a preponderance of the evidence. We conclude, therefore, that the district court met its obligation to make factual findings sufficient to support the government's claim of loss based on a preponderance of the evidence. See United States v. Patterson, 595 F.3d 1324, 1327 (11th Cir. 2010) ("We remind district courts of their obligation to make factual findings sufficient to support the government's claim of loss based on a preponderance of the evidence, when the defendant challenges that claim.").

### 8. REASONABLNESS OF YVONNE'S SENTENCE

Yvonne challenges both the procedural and substantive reasonableness of her sentence. Specifically, Yvonne contends that her sentence of fifty-four months of imprisonment, followed by three years of home confinement and substantial community service, was improper because it was based on erroneous sentencing

enhancements, unwarranted sentencing disparity, and an unduly harsh application of the sentencing criteria under 18 U.S.C. § 3553(a).

"We review sentencing decisions only for abuse of discretion, and we use a two-step process." United States v. Shaw, 560 F.3d 1230, 1237 (11th Cir. 2009); see also Gall v. United States, 552 U.S. 38, 41, 128 S. Ct. 586, 591 (2007). In the first step, we "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." Shaw, 560 F.3d at 1237 (quoting Gall, 552 U.S. at 51, 128 S. Ct. at 597).

In the second step, we "review the sentence's 'substantive reasonableness' under the totality of the circumstances, including 'the extent of any variance from the Guidelines range.'" Id. (quoting Gall, 552 U.S. at 51, 128 S. Ct. at 597). "Review for reasonableness is deferential." United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005). For example, "we recognize that there is a range of reasonable sentences from which the district court may choose, and when the district court imposes a sentence within the advisory Guidelines range, we

47

ordinarily will expect that choice to be a reasonable one." Id. "[T]he party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in the light of both th[e] record and the factors in section 3553(a)." Id. at 788.

After Yvonne was convicted, the U.S. Probation Office prepared a PSR. The PSR calculated Yvonne's guidelines as follows: base offense level 7, pursuant to U.S.S.G. § 2B1.1(a)(1); plus 18 levels for amount of loss, pursuant to U.S.S.G. § 2B1.1(b)(1)(J) ($2.5–7 million loss); plus two levels for number of victims, pursuant to § 2B1.1(b)(2)(A)(i) (between 10–50 victims); plus two levels for sophisticated means, pursuant to § U.S.S.G. § 2B1.1(b)(9)(C); and, plus two levels for gross receipts exceeding $1 million from financial institution(s), pursuant to U.S.S.G. § 2B1.1(b)(14)(A). Yvonne's resulting guideline range was 108 to 135 months of imprisonment, based on her adjusted offense level of 31, and criminal history category I. Yvonne filed written objections to the PSR with the district court. At sentencing, the district court overruled Yvonne's objections.

After carefully reviewing the sentencing transcript, the relevant guideline provisions, and the parties' briefs, we conclude that Yvonne has not demonstrated the district court committed any "significant procedural error, such as . . . improperly calculating[] the Guidelines range, . . . failing to consider the § 3553(a)

48

factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence."  Shaw, 560 F.3d at 1237 (quoting Gall, 552 U.S. at 51, 128 S. Ct. at 597).  We have previously addressed why the district court's amount of loss calculation was reasonable based on the law and the factual record before it and will not repeat that discussion here.  We conclude that Yvonne's remaining objections to the district court's calculation of her guidelines—such as the number of victims, sophisticated means, and gross receipts exceeding $1 million—are without merit and do not warrant further discussion. The district court did not err in calculating Yvonne's Sentencing Guidelines based on the record it had.  Further, our review of the sentencing transcript leads us to conclude that the district court carefully considered the § 3553(a) factors in arriving at Yvonne's ultimate sentence of fifty-four months of imprisonment.

After reviewing Yvonne's written objections and taking into consideration her arguments at the sentencing hearing, the district court stated: "I am going to go below the guidelines because I agree . . . that while [Yvonne] does qualify for those guidelines, but when you look at the total circumstances of her case I think the guidelines are far too high for her."  Thereafter, the district court expressly indicated it had "considered the advisory guideline range, together with the statutory factors set forth in 3553. . . . [and] while [it] did not grant some of the

49

objections . . . [it is] taking into consideration some of those objections or the nature of those objections as part of the evaluation of the statutory factors, . . . [for] going below the guideline range." In short, the record makes clear that the district court carefully considered the § 3553(a) factors.

We also conclude that Yvonne's sentence of 54 months—half the low end of her advisory guideline range of 108 months—is substantively reasonable. That Yvonne's coconspirators Blair, Linton, and Pottinger received a lower sentence than she does not create an unwarranted sentencing disparity because they were not similarly situated to her. For example, they cooperated with the government and pleaded guilty. See United States v. Reguiers, 240 F.3d 1321, 1325 (11th Cir. 2001). Based on the totality of circumstances in this case, we cannot say the district court abused its considerable discretion in imposing Yvonne's sentence. See United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc) ("[T]he abuse of discretion standard allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment.") (quotation marks omitted); see also United States v. Irey, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc) ("A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3)

50

commits a clear error of judgment in considering the proper factors.") (quotation marks omitted).

## 9. RESTITUTION ORDER

This issue only relates to Garry because Yvonne stipulated to the amount of her restitution.

Garry argues that the district court's order of restitution entered on September 3, 2010, in the amount of $4,779,830.99 was improper for two reasons. First, it was entered almost three months after the 90-day statutory period had expired. See 18 U.S.C. § 3664(d)(5) (2006). Second, he argues the amount of restitution was unwarranted because it was not based on the loss actually caused by his conduct. In particular, Garry argues the district court failed to make requisite findings based on reliable, specific evidence, as to the amount of actual loss and causation. He also notes that the district court found only five victims at the restitution hearing, which differed from the ten or more victims it found at the sentencing hearing.

The government responds that the district court properly deferred determination of the restitution amount until 90-days after sentencing, which occurred on March 31, 2010, because the victims' losses could not be ascertained before sentencing. The government further asserts that the delay beyond the 90-

51

days after sentencing was justified and resulted from the parties' agreed efforts to negotiate with the victim lenders and to stipulate to the loss amount. As for the amount of restitution, the government argues it was based on the properly calculated loss at the time of sentencing.

The legality of an order of restitution is reviewed de novo, the factual findings underlying a restitution order for clear error, and the determination of the restitution value of lost or destroyed property for abuse of discretion. United States v. Valladares, 544 F.3d 1257, 1269 (11th Cir. 2008). This Court is required to examine its jurisdiction sua sponte and reviews jurisdictional issues de novo. United States v. Lopez, 562 F.3d 1309, 1311 (11th Cir. 2009).

The district court was required to order restitution in this case under the Mandatory Victims Restitution Act of 1996, Pub.L. No. 104-132, 110 Stat. 1227, now codified at 18 U.S.C. § 3663A (2006). Under this Act, a person convicted of any crime against property, including any offense committed by fraud or deceit, is required to make restitution to the identifiable victim of the offense. 18 U.S.C. § 3663A(c)(1)(A)(ii), (c)(1)(B). Pursuant to 18 U.S.C. § 3664(d)(5), the district court may defer the determination of restitution up to 90 days after sentencing, if the victim's losses are not ascertainable within 10 days prior to the date of sentencing. The Supreme Court recently held that a sentencing court's failure to

52

impose an order of restitution within the 90-day limitations period does not deprive the court of the power to order restitution at some later date. See Dolan v. United States, ___ U.S. ___, ____, 130 S. Ct. 2533, 2539 (2010). The Supreme Court noted that, "[e]ven in the unlikely instances where [a] delay does cause the defendant prejudice," the court may consider the prejudice from the delay, the reason for the delay, and the party responsible for its cause. Id. at 2542. The Supreme Court, however, declined to specify how such equitable concerns should be taken into consideration. Id.

Further, a restitution order must compensate the full amount of the victims' losses and must be based on the amount of loss actually caused by the defendant's conduct. United States v. Huff, 609 F.3d 1240, 1247 (11th Cir. 2010). The amount of loss arrived at for sentencing purposes "does not necessarily equal the amount of restitution to be paid because a defendant's culpability will not always equal the victim's injury." Id. (quotation marks and alteration omitted). The government has the burden of proving the amount of loss actually sustained by a victim for restitution purposes and must deduct any value that a defendant's fraudulent scheme imparted to the victims. Id.; see also 18 U.S.C. § 3664(e). Disputes over the amount of restitution are to be resolved by a preponderance of the evidence. 18 U.S.C. § 3664(e).

Applying these principals to Garry's case, <u>Dolan</u> forecloses any argument that the district court lacked jurisdiction or authority to impose an order of restitution more than 90 days after his initial sentence was imposed. Based on the totality of the circumstances, we conclude the district court was justified in delaying the restitution hearing here. On the government's motion, the district court set the restitution hearing for June 30, 2010, within the 90-day statutory period. Prior to the scheduled June hearing, the government filed its motion for judgment of restitution seeking a court order requiring Garry and Yvonne to pay restitution to the victims. The government's motion indicated that it had received declarations of victim losses from financial institutions directly linked to the crimes of conviction. Indeed, the motion identified specific counts of conviction from the indictment, specific victims, and specific loss amounts. At the June 30, 2010 hearing, the district court granted Yvonne's motion to continue the restitution hearing, without any objection from Garry, in order to provide the parties an opportunity to work out the restitution issues. The district court then reset the restitution hearing for July 21, 2010, but it was continued again after Garry filed a notice of conflict of hearing and Yvonne requested another continuance.

On August 19, 2010, the government filed an amended motion for judgment of restitution and a stipulation of restitution as to Yvonne.

54

As with its first motion, the government's amended motion for judgment of restitution specifically identified the crimes of conviction for which the government had received declarations of victim losses; specifically identified the victims claiming restitution; and the amount of restitution for each victim. Based on this accounting, the government argued Garry should be held accountable for $4,779,830.99.

Garry's restitution hearing was eventually held on September 3, 2010. Garry and the government were unable to resolve their dispute about the amount of restitution. During the restitution hearing, Garry asserted a broad denial of guilt, but failed to submit any evidence to contest the government's proposed restitution amount based upon declarations of the victims' losses. Besides a general denial of responsibility, the only specific objection Garry raised was argument that the government did not get appraisals to determine the market value of the subject properties. In doing so, Garry failed to preserve any other basis for challenging the restitution order, absent a showing of plain error.

As with the district court's calculation of loss at the time of sentencing, we conclude the district court did not err in determining the amount of restitution. "While the determination of the restitution amount is by nature an inexact science, . . . the district court is directed to engage in an expedient and reasonable

55

determination of appropriate restitution by resolving uncertainties with a view toward achieving fairness to the victim." Huff,  609 F.3d at 1248 (quotation marks omitted).  Based on the record before the district court, and the generalized and non-specific nature of Garry's objections and complete denial of any responsibility for restitution, we cannot say the district court's restitution order was based upon insufficiently specific and clear factual findings.  See Huff, 609 F.3d at 1248.  Indeed, the record supports the district court's restitution amount by a preponderance of the evidence.

## IV.  CONCLUSION

For the foregoing reasons, we affirm the convictions and sentences of Garry Souffrant and Yvonne Souffrant.

**AFFIRMED.**

56